The plaintiff sued the defendants jointly upon two causes of action: 1st. That they wrongfully and maliciously alienated the affections of his wife and enticed her away from him.2d. That they harbored his wife after being forbidden to do so. The jury returned a verdict against the plaintiff on the first cause of action. On the second cause of action they found for the plaintiff and awarded him $1,500 damages. The defendants denying the material allegations of the complaint, say that the plaintiff's wife left home with his consent to seek work. That she refused to return to him. That their conduct was without malice to the plaintiff, and because of their relationship to his wife in good faith and to assist a neglected daughter and sister in her unhappy condition, etc.
The plaintiff testified that he married Eunice Parker (146) during the year 1891 and lived with her at Aulander about six years. He failed in business in 1892. That he kept boarders and hired horses. In 1897 he left Aulander and his wife went to live with her sister, the feme defendant, near the town of Aulander. She asked permission to go. Said that her sister wanted her to help trim hats, and he thought that it was better for her to do so. That he was traveling and away from home a great deal. That defendants and he were friendly and up to that time he had always supported his wife. After she went there all went on smoothly and he visited her. He went to Greensboro to live at the suggestion of the defendants, Benthall *Page 106 
and wife, who said it was a good place to live, and plaintiff could make money there. He corresponded with his wife, both writing frequently. Plaintiff introduced certain letters indicating affectionate regard on the part of his wife. He received a letter from her which he destroyed, which troubled him very much. He left Greensboro immediately for home; went direct to defendants' house, where he met his wife, who greeted him kindly but seemed to be in distress. He stayed there until night; his wife said she was in great trouble and wished to be moved away. Said that she wanted to go at once. He asked her to go to ride with him, she consented, but her sister, Mrs. Benthall, objected — said that she wanted his wife to help on some work. His wife said she would go some other time. He saw defendant Benthall later in the evening. Mrs. Benthall seemed mad at plaintiff; said things could not go or as they were, that he was not trying to provide for his wife. He took supper there; wife went on porch with him; Mrs. Benthall called his wife in, slammed the door, locking it. His hat was on the inside and Mr. Parker got his hat and he left. The next day he received a letter from his wife which was put in evidence. She wrote that she had decided not to have anything more to do with him unless he made a great (147) change in himself; that she had tried him for six years and the prospect of his making a living had been gloomy for a long time; that she was not going to be supported any longer by some one else's money. She had rather work for her own living than live that way. That she had hoped for a change, etc. That her people were willing to take care of her but were not willing to take care of him, and that he must not come any more until she sent for him. That she was not mad with him but did not want him to bother her any more until he could do her some good. She had considered the matter well and that no one was putting her up to it, she was acting of her own free will; said that she would return the "things" which she has; that he had spent the lot which her father had given her.
Witness said that he went at once to defendant and saw his wife in the presence of Mrs. Benthall, and asked his wife why she wrote the letter. She replied that it was to protect herself. He said that he had come to move her away with the furniture. She said that she would not go; he said that he would get a divorce — she objected. He said this to see what effect it would have on her. He testified to his affection for his wife. His furniture, horse and buggy were a? Benthall's. While he was insisting on his wife's going with him Benthall came up and said if they could not agree they had better divide up. She *Page 107 
agreed to give up half the property and witness took some of it away and took out process for the balance; when the officer went witness did not go in. Saw his wife and took hold of her, telling her that she must go with him. She pulled back, crying a little. Witness told her she had to go; said she would go if he would let her dress. Witness agreed to this, but would not let her go in the house; told her that she could go in the office near by. Clothes were brought and she dressed and got in a cart with witness. Before she went in the office Benthall interfered — started towards witness rolling up his sleeves; said he did not want anything like that going on there Officer stopped him and Mr. Benthall (148) took hold of his wife's arm and tried to take her from the witness. His wife went to his father's and stayed there two days and nights. Warrant was taken out against the witness for assault. He and his wife lived as man and wife for two days. Went to the trial and witness was convicted and fined. After the trial his wife went with her brother to the defendants'. The arrangement with Benthall was that witness's wife was to help her sister trim hats and not pay board. Witness was to pay board when there. He identified a letter which he had given to a schoolteacher, and said that he got the letter back by mail at once. It was addressed to Mr. Benthall at his postoffice, which was kept in his store by Mrs. Benthall. It forbade the defendants from harboring, employing or giving shelter or food to plaintiff's wife. That he was ready, willing and able to take care of her. The letter was lost — was dated December, some five months after the trouble with his wife. There was other testimony tending to corroborate plaintiff.
Mrs. Powell testified for defendants that she went to defendants' October, 1895, and lived there twenty-two months before she separated from her husband. She went there because her husband thought it best to do so. She denied several of the statements of her husband. No one counseled her to leave her husband or prevented her from living with him. Neither of the defendants did so. When they divided property he asked her for the engagement ring — said it would help him in getting another girl. She described the treatment of her when she dressed in the office. He pulled her down — she had on morning wrapper, and during the scuffle the buttons were torn off. Told him that she would rather die than go with him. He said she had to go; would take her dead or alive. Mr. Newsome said: "Don't let the woman dress in the road." He agreed to let her go in the office. He went with her in the office, (149) holding her arm. Went with him because she could not help *Page 108 
it. She had lost confidence in him. When she first mentioned to the Benthalls her intention of separating from her husband, they told her to use her own pleasure; they would not advise her about it.
Defendant W. T. Benthall testified that he married Mrs. Powell's sister. Powell came to see him and made arrangements to move his wife to witness's house and to keep his furniture. Told him that he would charge nothing as she was his wife's sister, that she could help his wife about the house. Did not ask plaintiff to come or let his wife come. He asked witness to take her. When he went to Greensboro Powell borrowed $10 from witness. When he came back said he had twenty-six cents. Witness gave Mrs. Powell no advice about leaving her husband; knew nothing of any trouble between them. On the night he stayed at witness's house he said: "What is the matter with Eunice?" Witness asked him what he meant — said she did not talk to suit him. Powell never seemed out of humor with witness until Mary Parker carried a message; he then talked as if some one was trying to take his wife away. Witness told him he had nothing to do with it; that he would take his wife to the station any time she wanted to go. Powell wrote a note about harboring his wife; read it to Mrs. Powell. When he read it he said: "Eunice, you will have to move." She said: "If you and my sister will not let me stay I will have to go somewhere. I will live in a hollow tree before I will live with Mr. Powell again." Witness testified that she was his wife's sister and he could not drive her from his house. Mrs. Benthall said nothing. Heard about Powell's publishing notices forbidding any one to let his wife stay in their house. Told his wife. Mrs. Benthall testified that when plaintiff was pulling his wife in the road she heard her (150) screaming and went to her; she was down in the road in the mud, her clothes torn almost off, her body was exposed. Went to her but was repulsed by plaintiff. Gave no advice or suggestion at any time to sister about leaving her husband, or prevented her from returning to him. Had let her live in the house because she was her sister and wanted to stay. There was other corroborative testimony. At the close of the evidence defendants renewed their motion for nonsuit, which was refused. Defendants excepted. The defendants asked the court to charge the jury: "The defendants had the right to permit their sister to live in their house, and to give her such countenance, comfort and support as her condition seemed to require, although she had separated from her husband without just cause, and although the plaintiff, after said separation, *Page 109 
forbade the defendants to give shelter, comfort and support and protection to his wife, and the jury should answer the second issue `No,' unless they find that the defendants wrongfully induced the plaintiff's wife to leave her husband, alienate her affections from him, notwithstanding the defendants did give to the plaintiff's wife, after she left her husband, such shelter, comfort and support." The court refused the prayer, and defendants excepted.
The court in charging the jury upon the second issue explained the law regarding the right of the husband to the society, etc., of the wife, and of her duty to live with him and submit to his control, etc. Also, as to the duty of the husband to support his wife and by what treatment he would forfeit his right to her society, etc., after which his Honor said: "Now, gentlemen, applying these principles to the case at bar, the court charge you that if you find from the evidence that the defendants or either of them allowed and permitted the plaintiff's wife to life at the home of Mr. Benthall, after the plaintiff had objected to her doing so, such objection having been made known to the defendants, or either of (151) them, then should answer the second issue `Yes,' unless you find that the wife of the plaintiff left him on account of cruel treatment to her, or from one of the causes to which I have before referred as grounds upon which the wife may leave and separate from her husband."
The court further charged the jury that the burden was on the defendants to show justification on the part of the wife for leaving the plaintiff against his will. That the fact that defendants were the brother-in-law and sister of plaintiff's wife could not justify them or either of them in allowing her to remain at the house of Mr. Benthall against the will and after objection by the husband, but they must show that the wife was justified in leaving. To these several instructions the defendants duly excepted and from a judgment for the plaintiff appealed.
His Honor's instructions are based upon certain legal propositions which are challenged by the defendants' exceptions. They are: that, if the wife separated herself from her husband without his consent, her sister and brother-in-law become liable to an action for damages on the part of the husband, if, after being forbidden to do so, they permit or allow *Page 110 
her to remain in their home, unless they can show affirmatively that the wife was justified in separating from her husband. The jury by their verdict on the first issue excluded any suggestion that defendants alienated her affections or enticed her away from her husband. His Honor eliminates from the consideration of the jury any question as to the relationship of the defendants to the wife, or motive with which they allowed (152) her to remain in their home, or active interference with her movements by advice or counsel. In the view of his Honor the plaintiff's cause of action accrued when the defendants failed, after being notified by the husband, to compel his wife to leave their home. The testimony, considered with reference to the instruction in regard to the manner in which the wife originally became an inmate of the defendants' home, etc., could only be considered by the jury upon the second issue to ascertain whether they permitted her to remain after being forbidden to do so, and whether they were justified in doing so.
The testimony of the plaintiff is that he permitted his wife to live with defendants without paying board, compensating them by helping her sister with her work. It seems that the husband, having been unfortunate in his business, found it desirable to leave his home to seek employment. The wife begins a correspondence with him indicating affection and attachment. After some time she writes him a letter which he says troubled him and brought him home. The contents of this letter are not given, but it is said by him related to his indebtedness. When he gets home his wife meets him and something is said about going to ride. The testimony in regard to the meeting and the incidents of the first night is conflicting. It appears, however, he slept at defendants' house, but not in the same room with his wife. On the next day his wife writes him a letter saying that she has decided not to return to him unless he changes his mode of life, etc. He at once went to see her, and in the presence of Mrs. Benthall talked the matter over with her — she repeating her purpose to separate from him. Something was said about dividing their personal property. Plaintiff after this took out process for the possession of the property and went to defendants' house with the officer. His wife was in her morning wrapper, and the scene occurred as detailed in the evidence. He took her to his father's for two days and nights during which time they lived (153) as man and wife. After attending a trial before the Justice, the wife, in a buggy with her brother, returned to defendants' house and remained until December, when plaintiff *Page 111 
wrote a letter to defendant Benthall forbidding him to "harbor, give employment or shelter his wife, stating that he was ready, willing and able to care for her." It was also in evidence that he had posted public notices forbidding other persons doing so. It was in evidence on the part of the defendants that upon receipt of the letter he said to plaintiff's wife that she must move — to which she responded that if they would not let her stay she must go somewhere else; that she would live in a hollow tree before she would live with her husband. The defendant testified: "Mrs. Powell was my wife's sister and after this I could not drive her from my house." Mrs. Benthall and Mrs. Powell testify to substantially the same facts — all of them testifying that defendants did not at any time advise or counsel her to separate, or to continue to remain away from her husband. It was in evidence that the plaintiff had no home to which he could carry his wife, nor any means with which to support her. Except on the occasion referred to there was no evidence of cruelty on the part of the husband. We should be reluctant to excuse or justify the conduct of either husband or wife, or of third persons, encouraging separation or withdrawal of marital rights or refusal to recognize or discharge marital duties. We should adhere strictly to the wise and salutary principles announced and enforced by the great judges who have preceded us, as essential to the sanctity of this relation which forms the basis of our social and domestic life. On the other hand we should be equally reluctant to adhere to the conceptions of a past age regarding the status of the wife and the power of the husband over her person and conduct. We fully sympathize with the statement made in "ACentury of Law Reform," that there is no branch or department of (154) the law in which the change has been greater or the contrast more violent. It is not necessary to cite decisions of this Court to show that our predecessors have recognized and given expression to the change of public conscience and policy in this respect. Thirty years ago, this Court, speaking by SETTLE, J., said: "We may assume that the old doctrine that a husband has a right to whip his wife provided he used a switch no larger than his thumb, is not law in North Carolina. Indeed, the Courts have advanced from that barbarism until they have reached the position that the husband has no right to chastise his wife under any circumstances." S. v.Oliver, 70 N.C. 60. In 1891 Lord Chancellor Halsbury, in Reg. v. Jackson, 1 L. R. Q. B. D., 671, said: "The Court has satisfied itself that in refusing to go and continue in her husband's house (the petitioner) was acting of her own free-will and that she is not *Page 112 
compelled or induced by any one to refuse to continue to remain where she was before he removed her. I confess that some of the propositions which have been referred to during the argument are such as I should be reluctant to suppose ever to have been the law of England. * * * In the same way such quaint and absurd dicta as are to be found in the books as to the right of the husband over his wife in respect of personal chastisement, are not, I think, capable of being cited as authorities in a court of justice in this or any civilized country." He says: "The return seems to me to be based on the broad proposition that it is the right of the husband when his wife has willfully absented herself from him to seize the person of his wife by force and detain her in his house until she shall be willing to restore him to his conjugal rights. I am not prepared to assent to such a proposition." In this case opinions were written by the Master of the Rolls, and Fry, L. J., concurring with the Chancellor. The case is regarded as (155) the latest and best judicial expression of the law conforming to the sentiment of the most enlightened statesmen and jurists of the age. So far back as 1791, Lord Kenyon, who certainly was not a radical judicial reformer, said in Phillips v. Squire, Peake, 82: "The ground of this action is that the defendant retains the plaintiff's wife against the inclination of her husband, whose behavior he knows to be proper; or from selfish or criminal motives. But where she is received from principles of humanity the action can not be supported. If it could, the most dangerous consequences would ensue, for no one would venture to protect a married woman. It is of no consequence whether the wife's representation was true or false. This kind of action materially differs from that of harboring an apprentice, the ground of that action being the loss of apprentice's services." The plaintiff was nonsuited.
In Turner v. Estes, 3 Mass. 317, the Court said: "The defendant is charged with enticing the plaintiff's wife. No evidence was given at the trial of any enticing. As to the charge of harboring, the sum of the evidence is that the defendant permitted his wife's mother to remain in his house without using force to expel her. He was not obliged to use force." These authorities fully sustain the defendant's exception to the charge. We think that his Honor was also in error in placing upon the defendants the burden of showing justification. Barnes v. Allen, 40 N.Y. 390. The learned Justice says: "The gist of the action, as all the authorities agree, is the loss without justifiable cause of the comfort, society and services of the wife. In maintaining the action two questions principally *Page 113 
arise: Was the loss occasioned by the voluntary action of the wife upon justifiable cause, or was it occasioned by the acts or persuasion of the defendant without any real cause and in bad faith towards the plaintiff? On both these questions the plaintiff must give evidence tending to establish his case or his action must fail." The error in the instruction, in (156) this particular, is that it overlooks entirely the motives and casts the burden of proving the truth of the wife's statement upon the defendant. We are further of the opinion that his Honor erred in telling the jury that they could not consider the relation of the defendants to the plaintiff's wife. Upon the question of good faith the relationship was most material. It cannot be that a sister and her husband are to be treated as officious intermeddlers and wrongdoers for giving food and shelter to plaintiff's wife and permitting her to remain in their home. We do not intend to say that if it appeared that they actively procured the separation, or counseled and advised of its continuance, they would not be liable — but where the question of motive is essential to be shown, the relationship is not only relevant but most material. After a careful examination of the testimony, we fail to see any evidence fit to be submitted to the jury to sustain the affirmative of the issue. In view of all the evidence, we think his Honor should have given the instruction asked upon the second issue. He could not have dismissed the action pending the trial upon the first issue. The finding upon that issue practically put an end to the case. The plaintiff relied upon Johnson v. Allen,100 N.C. 131. That was a case in which the plaintiff sued for "enticing, harboring and debauching" his wife. The testimony was ample to sustain the allegation. The language of the Court must be taken in the light of the testimony. There is a vast difference between the case of a man who entices another man's wife away from him and debauches her and the facts in this case. The conclusion to which we have arrived renders it unnecessary to pass upon the exceptions of the defendants' counsel in regard to the form of the issue and the verdict. It is not improper to say, however, that in the light of what is said in Pearce v. Fisher, 133 N.C. 333, the exception should be sustained. For the error pointed out there must be a
New trial. *Page 114 
(157)