LEWIS BAILEY, Appellant, v. JELENA KENNEDY, Administratrix.

**Husband and wife:** ALIENATION OF AFFECTION : BURDEN OF PROOF: EVIDENCE. Where the petition in an action for the alienation of affection alleges that defendant by protestations of love and affection did alienate the wife's affection and induce her to leave the plaintiff, and the allegations were denied by defendant, the plaintiff had the burden of showing that defendant's conduct resulted in the alienation of his wife's affection, and that it was in itself wrongful or was done with intent to alienate her affection. In this action the evidence is reviewed and held insufficient to warrant a verdict for plaintiff.

*Appeal from Cedar District Court.*—HON. W. N. TREICHLER, Judge.

WEDNESDAY, MAY 11, 1910.

THIS is an action for damages for alleged alienation of affections of the plaintiff's wife. There was a directed

verdict for the defendant, and the plaintiff appeals.—*Affirmed.*

Geo. C. Hoover, Ranck & Bradley, and Tillman Todd, for appellant.

Baker, Ball & Ball, J. H. Preston, J. T. Moffit, and Carl H. Mather, for appellee.

EVANS, J.—George C. Sanger was the original defendant. Shortly after the commencement of the suit, he died, and his administratrix was duly substituted. In the discussion of the case it will be more convenient for us to refer to Sanger, whose acts are called in question, as the "defendant," rather than his administratrix. The plaintiff alleged in his petition that about nine years previous the defendant "did by protestations of love and affection, undue influence, and other means, alienate the affection of the wife of the plaintiff." He also alleged that the defendant induced the wife to refuse to return to plaintiff or to live with him, and that the defendant lived and cohabited with her as his wife, and so continued down to the time of the filing of the petition. These allegations were all denied in the answer. The petition was filed in April, 1907. The defendant died in June, 1907, and before the cause was reached for trial.

Under the issues as made, the burden was upon the plaintiff to show: (1) That the conduct of the defendant did result in alienating from plaintiff the affections of his wife; and (2) that such conduct of the defendant was in itself wrongful, or, if not wrongful in itself, that it was done with intent to alienate the affections of plaintiff's wife.

In advance of trial some depositions were taken on behalf of the defendant. These were all introduced in evidence by plaintiff in his main case. The motion to

direct the verdict was made at the close of the plaintiff's evidence. The story as disclosed by the evidence is a brief one. The plaintiff was a stepson of the defendant; his mother having married the defendant during the plaintiff's childhood. Out of this marriage a son and a daughter were born. The substituted defendant's administratrix is such daughter. Shortly prior to 1900, the defendant's wife, plaintiff's mother died. The defendant and his wife were at that time living in South Dakota, whither the defendant had moved from Cedar County sometime prior. After the death of his wife, the defendant moved back to Cedar County where he owned a farm. On one corner of this farm was a small dwelling occupied by the plaintiff and his wife. The defendant boarded with them for a short period. In the fall of 1900, the defendant moved into the main dwelling house upon the farm and employed the plaintiff and his wife to work for him there. The plaintiff's work lasted through corn husking. Thereafter the plaintiff went away. He testified that he left because the defendant would not employ him any longer, and that his wife would not leave because she had promised to work for the defendant until the 1st of March. In 1901 the plaintiff returned to the employment of the defendant and worked for him for some months and until February or March, 1902, at which time the defendant held a public sale upon his farm disposing of his personal property, as we understand the record. The plaintiff testified that during this period his wife refused to occupy the same room with him. After the public sale, the defendant left the farm, and the plaintiff and his wife went their way. The defendant went to the home of his married daughter at West Branch. The plaintiff's wife went to the home of her mother and did not live with the plaintiff after they left the defendant's farm. The evidence discloses no further association between the defendant and plaintiff's wife until 1903. In 1903 the defendant purchased a dwell-.

ing in the town of West Branch and occupied the same as his home. For a time a niece of his married daughter lived with him. Later he employed his daughter-in-law, plaintiff's wife, and she continued as his housekeeper down to the time of his death, a period of about four years. During this period the defendant visited his son in South Dakota, where he had formerly lived. Later the son removed to Idaho, and the defendant visited him there. The daughter-in-law accompanied him on each of these visits; the West Branch home being locked up in the meantime. The son so visited is a half-brother of the plaintiff. The plaintiff introduced in evidence depositions of such son and his wife and others who had opportunity to observe the demeanor of the defendant and his daughter-in-law, and all this testimony was distinctly adverse to the plaintiff's contentions. The defendant was an old man, partly paralyzed as to one hand, and seventy-four years of age at the time of his death. The testimony introduced by the plaintiff wholly fails to show any criminality in the relations between the defendant and plaintiff's wife, or any circumstances from which an inference of criminality could fairly be drawn by the jury. On the contrary, such testimony makes a strong affirmative showing adverse to the claims of the plaintiff in this respect.

The question for our consideration is reduced therefore, to the inquiry whether there was sufficient evidence from which a jury could properly find that the conduct of the defendant was wrongful in the sense that it did result in separating the plaintiff from his wife, and that such was the object maliciously intended by the defendant. The following excerpt from the testimony of the plaintiff as a witness discloses the previous relations of plaintiff and his wife:

After we were married we first lived in the house that belonged to Tom Tucker; lived there about six months; then went to Fred Lehrman's house, about a mile and

three-quarters from the other house; lived there three months probably; then went to the house at the southeast corner of George Sanger's place; lived there about six months; and then moved over to what was called the Tom James place; lived there probably six months. When my wife and I separated the first time, we were living in the little house on the southeast corner of George Sanger's place. We next went to the Hartupee place, down by West Liberty; lived there from fall until spring, three months; then went to my uncle Philip's. I think when my wife left the second time we was in the Gruwell house. From Uncle Phil's we went up on the Gruwell place; lived there three, four, or five months. I think we next moved up to the little house on the corner of the Sanger place. I expect we lived there three, four, or five months. We went back to my uncle's place and lived there probably a year, or a year and a half. We moved from there up onto T. W. Maxon's place, I think. Mr. Maxon at that time owned the place called the Gruwell place. I moved on it a good many times, a half dozen times; stayed there from three to five months each time, I guess, I don't know. I moved from the Gruwell place down on the Krab place, lived there three months. Then I went back on the old ground again. I lived up there on the Maxon place on the road until I went to Mr. Sanger's place, probably three months; went to the little tenant house on the corner of the Sanger place; that was at the time I went to Sanger's to husk corn.

Philip Bailey, an uncle of plaintiff, was a witness in his behalf, and testified as follows:

I do not remember visiting them except when they lived in my own house, and that was frequent; that was quite a while before they went to Sanger's. Before they went to the Gruwell house I was there almost every day. I took meals with them. He had no place rented; did not pay any rent for the house. He had no property there—no household goods. He owned a cow before he came to my place, only had one cow. I paid him for every day he worked on the farm. He worked for me that year probably from fifty to seventy-five days; worked in the neighborhood for others when he could get it. I saw Ann with a black eye when he lived on my place. He said that she bumped

her eye on the bedstead. She complained that he struck her in the eye, and he said that she struck it on the bedstead, and I tried to strike an average in the matter, and told him if he struck her he must not do it any more, and I said I could not have him living on my place if he abused his wife, and he claimed he did not abuse her. He used profane and obscene language frequently. I think it was in 1901 that they went to live on the Sanger farm. Mr. Sanger hired her to work in the house and him to work on the farm.

This testimony offered by the plaintiff in his own behalf shows quite conclusively that he was holding his wife's affections by a very slender thread, and, if it broke at last, this fact was not so remarkable in the light of the circumstances as to require us to look in other directions for the cause of it. It is urged in argument by appellant that his previous unhappy relations with his wife constitute no bar to the present action, and this may be conceded as a legal proposition. But these unhappy relations are a very important consideration when the mere loss of his wife's affection is put forward by the plaintiff as a circumstance sufficient to warrant the inference that such loss was caused by the conduct of the defendant, even though such conduct was not criminal nor in itself wrongful.

It is argued that a stranger may not harbor the wife of another, even though she live apart from her husband, without assuming the burden of showing good cause and good faith. This proposition involves a definition of the term "harboring," and we need not enter into a discussion of it. Taking the situation of these parties as it was in 1903, the plaintiff's wife was living apart from him and was in poverty and dependent upon her own efforts to make a living. If, under such circumstance, her father-in-law could not employ her, or even furnish her a home without being guilty of harboring her in an evil sense, then her situation was very helpless indeed.

We have gone through this record with much care, and we are satisfied that the evidence would not warrant

a verdict for the plaintiff. ' The circumstances shown are
all consistent with upright conduct and proper motives.  It
is argued that the circumstances are sufficient to cast upon
the defendant the burden of explanation.  We think the
most that can be said is that the circumstances constitute
a scintilla of evidence, and that they might be sufficient
to carry a suspicion of the possibility of criminal relations'
between the parties.  If the defendant had lived until the
trial, he might well have assumed the burden of explana-
tion, and a failure to do so might readily intensify the
suspicion.  But no explanation from him was possible
because of his death.

Certain alleged errors are argued by appellant based
upon the rulings of the trial court in the admission of
testimony.  It is sufficient to say that, if all the rulings
adverse to plaintiff were changed so as to be in his
favor, it would not save his case.

We think the trial court properly directed the verdict,
and its order is *affirmed*.