McLERY, Respondent, vs. McLERY, Appellant.

*January 15—February 10, 1925.*

*Husband and wife: Alienation of affections of husband: By parent: Malice: Agency: How proved: Declarations of agent: Evidence: Sufficiency.*

1. In an action against the mother of plaintiff's husband for the alienation of his affections, testimony of the plaintiff as to declarations of a sister of the defendant to the effect that she represented the defendant in ordering plaintiff and her husband out of their residence, which was owned by the defendant, was incompetent to prove that the sister was the agent of the defendant, there being no *prima facie* proof or independent evidence of agency, nor evidence showing knowledge by the defendant of the sister's acts, and no proof that she authorized them. p. 141.
2. The court should have withdrawn this highly prejudicial testimony from the jury in direct and positive language, and an instruction which allowed the jury to infer agency from the testimony of the plaintiff and other attendant facts and circumstances constituted reversible error. p. 142.

McLery v. McLery, 186 Wis. 137.

3. Plaintiff was required to establish by a preponderance of the evidence to a reasonable certainty, before she could recover, that defendant by her acts was the controlling cause of the alienation of the affections of plaintiff's husband, and that such acts were the result of malice or bad intent by defendant toward plaintiff.   p. 142.
4. When acts resulting in the alienation of affections are performed by a stranger they are presumed to be malicious, but when performed by persons near of kin, especially in the relation of parent and child, the presumption is reversed. p. 142.
5. The main uncontroverted facts upon which plaintiff must rely in case of a new trial are *held* insufficient to show that the defendant did in fact exercise a controlling influence in alienating the affections of plaintiff's husband, or to show that the defendant, in what she did, was actuated by malice or evil design; and the complaint is ordered dismissed.   p. 148.

APPEAL from a judgment of the circuit court for Jefferson county: GEORGE GRIMM, Circuit Judge. *Reversed, with directions.*

This was an action for damages for alienation of the affections of plaintiff's husband by the defendant. Judgment was had for the plaintiff on a verdict of a jury for $7,000 and costs. Defendant appealed.

For the appellant there was a brief by *Easton Johnson* of Whitewater and *Jeffris, Mouat, Oestreich, Avery & Wood* of Janesville, and oral argument by *Otto A. Oestreich.*

For the respondent there was a brief by *Skinner & Thauer* of Watertown, attorneys, and *Marvin W. Wallach* of Chicago, of counsel, and oral argument by *Mr. Wallace Thauer* and *Mr. Wallach.*

CROWNHART, J.   The appellant claims error on the trial below in the admission of incompetent testimony and the instructions to the jury thereon.

The action was brought against the defendant and her sister, Carrie Lumsden, but the defendant Lumsden was not served and did not appear. On the trial the plaintiff was permitted to prove declarations of Carrie Lumsden to the effect

that she was the agent of defendant with reference to ordering plaintiff out of the residence of plaintiff and her husband on the day of their final separation. This occurrence, if occasioned by defendant's connivance, was a very material factor in establishing plaintiff's cause of action. The plaintiff testified in this respect over the objection of the defendant:

"She said that she represented *Mrs. Joe McLery* in her absence; she couldn't be there on account of my father-in-law's illness, and that I had to leave the house immediately. . . . That I was worrying my husband to his grave, and that I was a millstone around his neck dragging him down until he had lost all his friends, and his position in the neighborhood amongst the neighbors; that I called myself a nurse, but she considered me a very, very low woman, and that I had to go out of the house immediately. I told her I didn't have to get out of the home; she said I was mistaken, that the home belonged to *Mrs. Joe McLery,* and I said not as long as my father-in-law lived; she said, 'your father-in-law is a pauper and his wife has every nickel that he owns, and she will never even let you stay over night in the house.' I appealed to my husband and he simply turned his back; he seemed to feel rather badly about it. I said, 'I have no home, I have no money, where am I going to go?' She said she didn't care where I went, that they had allowed me to stay there long enough the way I had been going and conducting myself, and that I had always professed an affection for my father-in-law and that I wouldn't come home and take care of him. I told her the circumstances under which I had worked, the place, and she laughed at me and said she didn't believe me, that I ought to come anyway; I should have come home to him if I cared for either him or my husband; I told her I couldn't come, explained how it was, but she wouldn't let me explain, just urged me to get out of the house, to leave immediately; she called me a pauper, she said I had nothing, I was just an ordinary working girl and that they had been very good to put me into a home and the social position they had at that time. She also said that I should be ashamed of myself and the way I had conducted myself while in that home; she said 'every stick and

every beam of this house belongs to my sister.    I am here to represent her and you must get out.' "

The court gave the following instruction with reference to this testimony:

"The acts of a duly authorized agent are in law imputed to his principal.    Testimony has been given to the effect that Mrs. Lumsden ordered the plaintiff out of the house and that she claimed to be authorized thereto by the defendant. The truth of that testimony is denied by both Mrs. Lumsden and *Mrs. Joseph McLery,* the alleged agent and principal. But even if true such testimony does. not in law establish agency.    It is at most only evidence of. what Mrs. Lumsden said, but not that the agency in fact existed.    Agency may be established by the testimony of the agent or the principal or as the reasonable inference from the acts of the parties in connection with the attending circumstances, but not by mere proof that someone claimed to be the agent of another."

We have searched the record in vain to find the "acts of the parties in connection with the attending circumstances" from which a reasonable inference could be drawn that Carrie Lumsden was in fact the agent of defendant at the time and for the purpose of the transaction in question.    Defendant's husband was very ill—he died January 8th following,—and Carrie Lumsden was staying with defendant helping her care for the sick man.    One may judge from the evidence that she was forward and assertive in her manner. Plaintiff and her husband were having a domestic altercation of serious proportions, at their residence, when Carrie Lumsden, the aunt, appeared on the scene, with the result disclosed by the quoted evidence, assuming the accuracy thereof. Nothing else appears to disclose agency, and the fact of such agency is denied by defendant, her son, and Mrs. Lumsden. However, assuming the accuracy of the testimony of plaintiff, and the attendant circumstances, it falls far short of proof of agency.

Counsel for plaintiff cite the rule from 2 Corp. Jur. pp. 939 and 945, as follows:

"While the declarations of an alleged agent are of themselves incompetent to prove agency, if the agency is otherwise *prima facie* proved, they become admissible in corroboration, where they constitute a part of the *res gestæ* and were made at the time of the transaction in question. Thus, where the agency has been established by independent evidence, the declarations of the agent are competent to show that he acted as agent and not on his individual account, or to show the nature and extent of his authority." 2 Corp. Jur. 939.

"As a general rule, the fact of agency or the extent and scope thereof cannot be established by proof of the acts of the pretended agent, in the absence of evidence tending to show the principal's knowledge of such acts, or assent to them. But where there is further evidence that the alleged principal authorized or knew of the acts of the alleged agent and made no objection, or where the acts are of such a character, and so continued, as to justify an inference that the principal knew of them, and would not have permitted the same if unauthorized, the acts themselves are competent evidence of agency." 2 Corp. Jur. 945.

The rule as above stated seems to be an accurate statement of the law as held by this court. *Somers v. Germania Nat. Bank,* 152 Wis. 210, 218, 138 N. W. 713; *McCune v. Badger,* 126 Wis. 186, 105 N. W. 667; *Roebke v. Andrews,* 26 Wis. 311; *Davis v. Henderson,* 20 Wis. 520; *McDonell v. Dodge,* 10 Wis. 106.

None of the conditions applicable to the exceptions as to the general rule existed in this case. There was no *prima facie* proof of agency, no independent evidence of agency, no evidence tending to show defendant's knowledge of Mrs. Lumsden's acts, and no proof of authorization of her acts. The rule is further elaborated, with citation of authorities, in 22 Corp. Jur. 376, as follows:

"Unless the agency is already apparent, or is admitted, or unless the statement has been ratified, the relation of agency

between the declarant and the person against whom it is sought to use his admission must be established by affirmative evidence other than the declarations or statements of the alleged agent. Such evidence may be either direct or inferential, but the agency of a declarant cannot be shown by the statement of another person, claiming to be an agent of the party sought to be charged, but whose authority is not shown to extend to binding his principal by such a statement."

The instruction of the court did not withdraw the improper testimony from the consideration of the jury, but on the contrary it left the jury to infer agency from said testimony and other attendant facts and circumstances. The testimony was highly prejudicial to the defendant and should have been withdrawn from consideration by the jury, in direct and positive language. Such an instruction was asked for in writing by the defendant but not given. For this error of the court the cause must be reversed.

The appellant contends the plaintiff failed to make out a case and judgment should be reversed with directions to dismiss the complaint, and this brings us to the merits of the action.

The plaintiff in the action was required to establish by a preponderance of the evidence, to a reasonable certainty, two propositions in order to recover: (1) that defendant, by her acts, was the controlling cause of the alienation of the affections of plaintiff's husband from her; and (2) such acts were the result of malice or bad intent on the part of the defendant toward plaintiff.

When such acts are performed by a stranger they are presumed to be malicious, but when performed by persons near of kin, especially in the relation of parent and child, the presumption is reversed. In *Baird v. Carle*, 157 Wis. 565, 147 N. W. 834, this court said:

"It was held by this court in *Jones v. Monson*, 137 Wis. 478, 488, 119 N. W. 179, that parents have the right to ad-

vise their married daughters to discontinue their marital relations with their husbands if they honestly believe that conditions are such as to demand separation, provided they act in good faith and have substantial reasons for believing that the advice given is proper.   It is also held in that case that if separation ensues and the husband brings an action to recover damages for the alienation of the affections of the wife, the burden is on him to show that the advice which tended to bring about the separation was given maliciously and in bad faith.   The weight of authority elsewhere is to the effect that this rule also extends to a brother or other near relatives of the wife.   *Powell v. Benthall,* 136 N. C. 145, 48 S. E. 598; *Trumbull v. Trumbull,* 71 Neb. 186, 98 N. W. 683; *Luick v. Arends,* 21 N. Dak. 614, 132 N. W. 353, 365, and cases cited; *Bailey v. Kennedy,* 148 Iowa, 715, 126 N. W. 181.   This rule is not only humane, but a contrary one would be almost intolerable."

In 13 Ruling Case Law, pp. 1472, 1473, the law with sustaining authorities is stated thusly:

"It is also now very generally held that in case of unhappiness and disagreements between a married couple, the law recognizes the right of a parent to advise a son or daughter; and where such advice is given in good faith and results in a separation the act does not give the other spouse a right of action, though in a similar case a stranger would be held liable.   A parent may not, with hostile, wicked, or malicious intent, break up the marital relations between his daughter and her husband, simply because he is displeased with the marriage, or because it is against his will, or because he wishes the marriage relation to continue no longer; but according to well-considered modern authorities he may advise his daughter in good faith and for her good to leave her husband, if on reasonable grounds he believes that the further continuance of the marriage relation tends to injure her health, or to destroy her peace of mind, so that she would be justified in leaving her husband.   In such case a parent may persuade his daughter, and use all proper and reasonable arguments, but the motive and the means employed are always to be considered.   It may be shown that the parent acted on mistaken premises or on false informa-

tion, or his advice and interference may have been unfortunate; still if he acted in good faith and for the daughter's good, on reasonable grounds of belief, he is not liable to the husband. And it has been said that the conduct of parents in such cases is to be liberally construed, and worthy motives are to be presumed. This rule has more frequently been applied in the case of advice given to a married daughter, but it is equally applicable in the case of advice given to a son."

Having the law in mind as thus expressed, we will very briefly state the main uncontroverted facts upon which plaintiff must rely in case of a new trial.

Ralph McLery had been in the navy during the late war, and there contracted tuberculosis. Upon his return he went to River Pines Sanitarium at Stevens Point for treatment. While there he met the plaintiff, a nurse in the institution. They shortly became engaged to be married. Plaintiff had been married prior thereto, and divorced. At the time of their marriage plaintiff was twenty-three years of age, and Ralph was twenty-two years of age. Neither of the contracting parties had any property, but Ralph had government compensation of $80 per month, which after marriage was increased to $90 per month. After the engagement Ralph wrote his parents, who lived on a farm near Sullivan, Jefferson county, notifying them of the engagement. Defendant replied in a friendly letter, and at the instance of her son and his fiancée she went to Stevens Point and met the young lady. The two women were cordial. The wedding took place on February 11, 1920, the wife continuing her professional work. The defendant had written the plaintiff a friendly letter inviting her to come and live with the parents. Later the plaintiff and her husband went to the parents' home, and lived there on fairly pleasant terms from August 9, 1920, until March 17, 1921. During this time defendant treated plaintiff with due consideration. In the meantime defendant and her husband built a house for

plaintiff and her husband on the farm, a quarter of a mile
distant from defendant's home, at a cost of $7,000, and on
its completion the young couple moved into the same, rent
free.  The new house was partly furnished by defendant.

The defendant did not attend the wedding on account of
a younger son being sick at the time.  She sent no wedding
gifts, but wrote plaintiff that she had purchased a cedar chest
and was filling it with useful household goods for her, which
she did.  After the young couple moved into the new house
the defendant waited on her with motherly care when plaint-
iff was sick, and did her household work.  From time to time
defendant made presents to plaintiff of wearing apparel and
household effects.  On the whole, the two women got along
pretty well.

On the other hand, Ralph was ailing much of the time.
He was peevish and easily excited.  He did little work.  He
spent considerable time playing cards for money at a local
resort.  He frequently went hunting.  The wife complained
to her husband about these things and they frequently quar-
reled.  They were not congenial.  The wife complained to
the defendant, and defendant told her that she understood
that Ralph did not lose much at cards; that he had to have
some amusement; that hunting was good for his health, and
that plaintiff should not expect too much.  The quarrels
between plaintiff and her husband grew more frequent and
more violent.  After a rather bitter quarrel in July, 1921,
Ralph went for his father and the father brought defendant
with him, the three coming to plaintiff's residence, and then
the father took the part of his son and became abusive of
plaintiff.  The mother took little part in the fray.  The
plaintiff left her husband at his instance and went to neigh-
bors.  Later, at the request of defendant, her son sought
the plaintiff, asked her to return to their home, which she
did, and a reconciliation took place.  Again for some time
the matrimonial waters were smooth, but later the old trou-

ble broke forth and the quarrels were renewed. Late in 1922 plaintiff went out nursing for hire. During this time her father-in-law became quite sick and Ralph wished her to return to assist in caring for his father. She could not very well return at the time because of the condition of her patient. Ralph became provoked, and when she did return he upbraided her and they quarreled. At this time when the quarrel was on, Carrie Lumsden came on the scene as a third party to the row. It was then that Carrie Lumsden ordered plaintiff out of the house, saying she was acting for the defendant. The row was heated, with plaintiff on one side and her husband and his Aunt Carrie on the other. Finally, plaintiff left and she and her husband have not since lived together. Defendant was attending her sick husband at the time of the last marital conflict between the young couple, and testified that she knew nothing about it or the actions of Carrie Lumsden. And there is no proof that she did know about the trouble before or at the time of the quarrel. Nor is there any proof that she in any way ratified the acts of Carrie Lumsden. The defendant's husband was a very sick man at the time, and died shortly after. Defendant had been spending nights and days looking after her husband's comfort. Hence it is quite reasonable that she took no part in the affair and that the testimony of Ralph and Carrie Lumsden to the same effect was true. Plaintiff, before she went out nursing just before the last trouble, had asked the defendant to make her a nurse's apron, which defendant promised to do. Then their relations were friendly, and there is no evidence of anything that defendant did from then on to disturb those friendly relations. After the separation she again urged her son to seek out his wife and have her return and live with him. This the son refused to do. So much for defendant's conduct.

As to the plaintiff. She was not wholly inexperienced. She had one matrimonial venture before. There is nothing to her discredit in that, but it should have had a sobering

effect. She knew Ralph's condition, physically and financially. There was no alluring prospect before her in such a marriage. It meant more or less of sacrifice of pride and position. It meant much unselfish devotion to a sick man. It meant reliance upon his people for assistance and a corresponding yielding of pride and independence on her part. These things she knew. These things she accepted as her dowry. In the trouble which followed she made no meek surrender. She held her own in the wordy battles. No blows were struck. She left her husband in high temper,' largely justified, but she never sought to renew her marriage relation. Rather, she sought surcease from sorrow in the action for damages from the mother-in-law in widow's weeds.

Courts do not sit to act as moderators in trivial domestic affairs. Courts recognize the law of domestic relations, and the law recognizes the mutual obligations of the family members. They recognize the imperfections of human nature, and require full performance of duties and genuine forbearance on the part of any member of the family before she gains a standing in court for redress of family wrongs. The family circle necessarily is enlarged by marriage to include near relatives of both husband and wife, and particularly does this include the parents of each, to whom children owe moral and legal obligations. Young people should know that aged parents may bring burdens upon them by reason of age and idiosyncracies of character. These burdens are assumed upon marriage and should be cheerfully accepted as far as possible. This is the law and the gospel. The young wife should not look for trouble nor scent it from afar. Kindness to her mother-in-law and consideration of her age and foibles usually will be more than compensated by a happy and contented family life. She has a noble example in the faithful Ruth of the Bible. At any rate, courts are reluctant to open the door of family discord for financial adventures.

The counsel for plaintiff point out a bill of particulars

containing twenty-seven overt acts. It requires a vivid imagination to magnify many of these into a grievance; some are not in accord with the weight of the evidence, and some are wholly unsustained. Altogether they are insufficient to show that the defendant did in fact exercise a controlling influence in alienating the affections of plaintiff's husband, nor do they show that in what she did she was actuated by malice or evil design.

The mother-in-law jokes are commonplace, and tend to disrespect where kindly treatment is due. Mothers-in-law are mothers as well. That fact should not be forgotten in the family life. When mothers are no longer held in high esteem, when their loving care is no longer desired, and they in their advancing age are to be treated only as a burden, then, and not till then, are mothers-in-law to be considered interlopers in the family life. In this case the defendant, under trying circumstances, was well disposed to perform the functions of both mother and mother-in-law. Wherein she failed, if she failed in some degree, she was excusable. There is little, if anything, to criticise in the conduct of the defendant, if we drop out the conduct of Carrie Lumsden, for which she was not responsible. We conclude it was this evidence as to Carrie Lumsden which induced the jury to render the verdict in this cause—a verdict so large as to indicate some bias on the part of the jury. There was no competent evidence to justify the verdict for the plaintiff, and it does not appear that any can be added by a new trial.

*By the Court.*—The judgment of the circuit court is reversed, with directions to dismiss the complaint.