KLEIST v. BREITUNG et ux.

(Circuit Court of Appeals, Second Circuit. April 11, 1916.)

No. 215.

1. HUSBAND AND WIFE ⬤⟿333(9)—ACTION FOR ALIENATION OF WIFE—SUFFICIENCY OF EVIDENCE.

Evidence *held* insufficient to show that defendants, who were the parents of plaintiff's wife, through malice or other improper motives, alienated her affections from plaintiff, or in fact that they tried in any way to so alienate her affections.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1124; Dec. Dig. ⬤⟿333(9).]

2. HUSBAND AND WIFE ⬤⟿324—ALIENATION OF WIFE—RIGHT OF ACTION AGAINST WIFE'S PARENTS.

Parents are justified in giving counsel and advice to a daughter, who has contracted a marriage with a man who is believed by them to be wholly unfitted to make her happy and to support her properly, and if they act without malice, and are prompted by affection for their daughter and solicitude for her health and happiness, they cannot be held liable for alienation.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1118; Dec. Dig. ⬤⟿324.]

In Error to the District Court of the United States for the Southern District of New York.

Action at law by Max Frederick Kleist against Edward N. Breitung and Charlotte M. Breitung. Judgment for defendants, and plaintiff brings error. * Affirmed.

E. C. Crowley, of New York City, for plaintiff in error.

Marvin, Hooker & Roosevelt, of New York City (Delancey Nicoll and Courtland V. Anable, both of New York City, S. W. Shaull, of Tropico,

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Cal., and Henry S. Hooker, of New York City, of counsel), for defendants in error.

Before COXE and WARD, Circuit Judges, and MAYER, District Judge.

COXE, Circuit Judge. [1] There can be no doubt that the secret marriage contracted between the plaintiff and the defendants' daughter was a mesalliance calculated to excite the gravest apprehensions for the future happiness of their daughter who was their only child. The plaintiff was five years her senior and had been employed as a coachman by a family residing next door to the defendants at Marquette, Mich., and was intimate with their servants. The marriage took place in New York and was not discovered by the defendants until a week later, while they were guests of the St. Regis hotel. The first interview between the plaintiff and the defendants occurred at the hotel on December 2, 1913. The conduct of the defendants on that and subsequent occasions must be gauged by their disappointment, mortification and chagrin on finding that their only daughter had contracted a marriage which in all probability would wreck her happiness and end in disaster. The words used by a distracted mother in such circumstances may be attributed as well to grief at the discovery that her daughter's career has ended in an unfortunate marriage, as to malice. That a woman in such circumstances should be calm, judicial and friendly at her first interview with the man who has caused her this mortification and sorrow is hardly to be expected. It is alleged that she said to the plaintiff:

"We are going to annul the marriage and if you don't annul it, why she will get a divorce from you anyway."

That she said this is denied by the defendants, but, assuming that it was said, it does not show malice, but rather a very limited knowledge of the law on the part of an agitated mother. It was perfectly natural that both the defendants should inquire into the details of the marriage for the purpose of having it annulled if illegal. The plaintiff's testimony that Breitung threatened to have him arrested for stealing his (Breitung's) silk socks is in the same category. If the threat were made seriously it was while Breitung was still angry over the discovery of the secret marriage. Nothing ever came of the threat and both parties, apparently, agreed to the fulfillment of the antenuptial agreement between the plaintiff and Juliet that she should live at home until he was able to care for her properly, and in the meantime the marriage was to be kept a secret. Breitung promised to get the plaintiff employment and offered him a place in a mine in New Mexico where he could learn mining engineering. If he made good he was to have Juliet in six months and was to correspond with her in the meantime. The plaintiff testified:

"When I accepted the position Mrs. Breitung put her arm around me, told me 'I hope you will do well down in this new place and I hope Juliet will be with you some day.'"

All this seems wholly incompatible with the presence of malice. The pretense that the defendants kept the young people apart is not

sustained by the proof, especially in view of the testimony of the plaintiff. On cross-examination he was asked as follows:

"Q. Now, Kleist, is it not true that your wife and yourself made an agreement to get married and not to live together? A. Yes, sir, for a short time until she came out in society. Q. Is it not true that the agreement was that you were to get married and not to live together until you were established and able to support her? A. Yes, I think we had that agreement between us. Q. And that in the meanwhile she was to live with her parents? A. Yes, she was to go back to live with them. Q. And you were to find employment and establish yourself in life so that you could support her? A. Yes, until she came out in society. Q. Until you were able to support her, wasn't that the agreement? A. No, not all of it. Q. Was not that a part of it? A. As soon as she came out in society whether I had a position or not she would come with me."

Up to the time that the plaintiff left New York, on Christmas Day, 1913, there is no proof that the wife's affections had been alienated. In answer to the motion to dismiss the complaint at the close of the evidence, counsel for the plaintiff stated as follows:

"Then, thirdly, we have the fact that up to the time of the departure of the plaintiff for the West on Christmas Day, 1913, the love continued; that is to say, one of the most ardent of all the love letters was written on the night before Christmas and received Christmas Day, so that we have, up to the time of the plaintiff's departure for the West, this condition of affection continuing, so that the change that has occurred must have begun during the absence of the plaintiff."

Manifestly the assertion that the alleged improper acts of the defendants, prior to the plaintiff's departure for the West, show a desire to alienate his wife's affections must be abandoned, in view of that admission that all the efforts of the defendants had utterly failed to alienate her affections.

There is absolutely no testimony of any act on the part of the defendants, or either of them, after the plaintiff's departure which can be regarded as an attempt to alienate their daughter's affections. Her account of the conversations with the plaintiff after his return from the southwest does not indicate that there was any disposition on the part of the defendants, or either of them, to influence her against her husband. The first talk was over the telephone, Juliet having called up the plaintiff to make an engagement with him to meet her at the Waldorf hotel on the following day.

At the meeting the next day the plaintiff, Juliet and her father were present. The plaintiff's account of this interview is as follows:

"I was rather glad to see Juliet and I just shook hands with her. She seemed to back away from me, and I said, 'What is all the trouble?' She said, 'I just wanted to tell you that I don't love you any more.' I says, 'That's funny; you loved me before I went away.' 'Well,' she says, 'I realize that I made a mistake.' I says, 'Won't you come with me now; I can make you happy?' She says, 'No, I don't think I will.' Her father then spoke up and says, 'Yes, Juliet, you better go along, probably he can make you happy.'"

Surely there was nothing in all this to indicate malice on the part of the father; so far as it went his advice to his daughter was to make an attempt to live with her husband. In short, we are convinced that should the case be sent back for a new trial and should a ver-

dict be rendered for the plaintiff, it would be the duty of the court to set it aside as against the evidence.

An examination of the testimony convinces us that, in view of all the circumstances, the conduct of the defendants was more conservative than that which would naturally be expected from the majority of parents. The difference in surroundings, the inability of plaintiff to support his wife, the secrecy of the wedding and all the circumstances connected with the marriage were calculated to produce outbursts of anger, disappointment and resentment. To the parents this ill-advised marriage may well have seemed the end of their daughter's happiness and they would have been less than human if they had not given expression to their resentment at the sudden termination of the ambitious career which they had probably marked out for their daughter. When, however, the first outbursts of anger were over, their conduct indicated a determination to make the best of a deplorable situation. As might be expected, the daughter's opinion changed, not from anything the defendants said or did, but because she had discovered that the plaintiff was not the Sir Galahad she had imagined him to be. His letter of March 24th from New Mexico may have had a tendency to enlighten her on this subject. He says, inter alia:

"It is terrible for you to lie so much do you not know that you will be sorry for it. It will hurt you and your family very much. If they would only do the right thing by me. *But* I have to labor like a Mexican Single Jacking in a mine. I am strong and have stood it without a murmur but I will stand it no longer. Have telegrams telling me to return to New York immediately which I *will do*. If I do not hear from you immediately. It is best that I get a divorce from you and you let free I love you dearly Juliet and you did too, when I left. I still have all the letters you wrote me. It will be evidence. *I do not wish to make trouble in no way.* But I have been mistreated in many ways.

"Your husband,                                                                 Max."

[2] The law applicable to these facts is very clear and is, perhaps, nowhere better stated than in Hutchison v. Peck, 5 Johnson, 196. The opinion of Chief Justice Kent is quoted by both parties and is as follows:

"I am also for a new trial. If the defendant did not stand in the relation of father to the plaintiff's wife, I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives the case a new and peculiar interest; this is the first action of the kind I have met with, brought against the father. A father's house is always open to his children; and whether they be married or unmarried, it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum. The father is under even a legal obligation to maintain his children and grandchildren, if he be competent, and they unable to maintain themselves; and according to Lord Coke it is 'nature's profession to assist, maintain and console the child.' I should require, therefore, more proof to sustain the action against the father than against a stranger. It ought to appear either that he detains the wife against her will, or that he entices her away from her husband from improper motives. Bad or unworthy motives cannot be presumed. They ought to be positively shown, or necessarily deduced from the facts and circumstances detailed. This principle appears to me to preserve in due dependence upon each other and to maintain in harmony the equally strong and sacred interests of the parent and the husband. The quo animo ought, then, in this case, to have been made the test of inquiry and the rule of decision. The Judge told the jury that if the defendant was not actuated by improper motives, it would go very far in mitigation of dam-

ages. I think the instruction should have gone further, and the jury have been informed that, in such a case, the verdict should be for the defendant. I am, accordingly, of the opinion that a new trial should be awarded, with costs to abide the event of the suit."

In Multer v. Knibbs, 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322, 9 Ann. Cas. 958, the court says:

"There is a material difference between the acts of a parent and those of a mere intermeddler. * * * It is proper for him to give to his daughter such advice and to bring such motives of persuasion or inducement to bear upon her as he fairly and honestly considers to be called for by her best interests. * * * And the burden is upon the plaintiff to show that the defendant has been prompted by malice in what he has said and done, and to overcome the presumption that he acted under the influence of natural affection and for what he believed to be the real good of his child."

In Beisel v. Gerlach, 221 Pa. 232, 70 Atl. 721, 18 L. R. A. (N. S.) 516, the court said:

"In actions of this character the question is whether the father was moved by malice and without justification, or by a proper parental regard for the welfare and happiness of his child. * * * A jury in the absence of sufficient evidence should not be permitted to guess at or conjecture about the rights and liabilities of parents and children in this class of cases."

The law is clearly established, at least in this jurisdiction, that parents are justified in giving counsel and advice to a daughter who has contracted a marriage with a man who is believed by her father to be wholly unfitted to make her happy and to support her properly. If he acts without malice and is prompted by affection for his daughter and solicitude for her health and happiness, he cannot be held liable for alienation. In short, the law takes a practical common-sense view of such situations as are here disclosed; it recognizes the relation of parent and child as well as the relation of husband and wife and in no case has a parent, who has acted in good faith, been mulcted in damages for advising, protecting and sheltering a daughter who has contracted an ill-advised marriage with a man who is unable to support her properly.

The judgment is affirmed with costs.