### NELSON et ux. v. NELSON.

(Circuit Court of Appeals, Second Circuit. January 7, 1924.)

No. 56.

1. **Husband and wife ⬅335—Whether husband's father joined in acts alienating husband's affections held for jury.**

   In wife's action against husband's parents for alienation of affections question of whether the father participated with the mother in the course of conduct alienating husband's affection for wife *held* for jury.

2. **Husband and wife ⬅335—Evidence in wife's action against husband's parents for alienation of affections held to make case for jury.**

   In wife's action against husband's parents for alienation of affections, in which there was evidence that the parents induced the husband to remain in their home, threatened to disinherit him if he did not send wife back to her parents, maintained an attitude of scorn toward the wife, criticized her physical and personal appearance, compared her in husband's presence unfavorably with other girls of their acquaintance, and told husband that he had made a mistake in marrying the plain-

tiff, and that by reason of such conduct the husband's love for his wife was destroyed, and in which the parents merely denied such evidence, and did not claim misconduct or unworthiness on the part of the wife, the question of the parents' liability was one for the jury.

3. **Husband and wife ⊕═333(1, 9)—Bad and unworthy motives cannot be presumed in an action for alienation of affections; motives must be proved positively or by necessary deduction.**

In wife's action against husband's parents for alienation of affections, bad and unworthy motives cannot be presumed, and ought to be positively shown or necessarily deduced from the facts and circumstances.

4. **Husband and wife ⊕═335—"Malice" properly defined in alienation of affections suit.**

In wife's action against husband's parents for alienation of affections, malice was properly defined as "a wrongful act done intentionally, without just cause or excuse.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Malice.]

5. **Husband and wife ⊕═333(2)—Circumstantial evidence competent to prove conspiracy to alienate affections.**

In wife's action against husband's parents for alienation of affections, circumstantial evidence was competent to prove a conspiracy between the parents to alienate husband's affections for wife.

6. **Husband and wife ⊕═325—Gist of wife's action for alienation of husband's affections stated.**

The gist of an action by a wife for alienation of husband's affections is deprivation of marital rights, including the society, affection, and companionship of the husband, and financial support during husband's life, in accordance with his rank and station.

7. **Husband and wife ⊕═326—That husband and wife were together on one occasion after acts and statements alleged to have destroyed husband's affections for wife held no defense.**

In wife's action against husband's parents for alienation of affections, based on acts and statements of parents while the husband and wife were living with them, the fact that the husband and wife were together on one occasion after husband had been induced to send wife back to her parents by his parent's threats to disinherit him on his failure to so do was no defense.

8. **Husband and wife ⊕═327—Each parent bound by acts of other pursuant to conspiracy to alienate son's affections for wife.**

Where parents conspired to separate son and his wife, each was a party to all acts done by the other before or after furtherance of the common designs.

9. **Husband and wife ⊕═333(3)—Evidence as to conference between husband and wife following husband's conference with parents held admissible to show husband's state of mind.**

In wife's action against husband's parents for alienation of husband's affections, evidence as to a conference between the wife and the husband after husband had had a conference with his parents *held* admissible to show the state of mind of the husband, and admission thereof was not an error where limited to such purpose.

Hough, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Vermont.

Action by Nell Rudisill Nelson against Thomas S. Nelson and wife. Judgment for plaintiff, and defendants bring error. Affirmed.

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

John G. Sargent, of Ludlow, Vt., and Robert E. Healy, of Bennington, Vt. (Walter C. Noyes, of New York City, of counsel), for plaintiffs in error.

Jones & Jones, of Rutland, Vt., and John W. Redmond, of Newport, Vt., for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The plaintiffs in error are the parents of Romeyn Nelson, who married the defendant in error on December 29, 1917. The defendant in error resided in Lincolnton, N. C., and her husband, with his parents, resided in Vermont. While a schoolboy, 15 years of age, he visited Lincolnton, N. C., in the summer of 1913, and there met his future wife. He paid her very affectionate attention, and at the closing days of his visit, before his return to school, they promised to marry. This was not to occur until he completed his education. They corresponded thereafter in a manner expected of this betrothal. Romeyn again visited at Lincolnton during the summer of 1915. The marriage took place when he was 19 years of age and she 21, during a visit at Lincolnton, and at the Christmas holidays in 1917. His parents knew of the engagement, but not of the marriage until after its celebration. Then, on January 7, 1918, the son told his parents. His father wrote the defendant in error approving her and the marriage, expressed a wish that Romeyn complete his education at Williams College, and he thanked her parents for their offer to take care of her for the two years that it would take Romeyn to finish—

"but we hope that they will be good enough to let us have you part of the time. You can tell them both Mrs. Nelson and myself are going to be a little selfish and I feel sure that they will not blame us. * * * Now that I have a daughter, which both Mrs. Nelson and myself have longed for, we shall be very choice of her. * * * Now, my girl, you both have our blessings and we will do all in our power to make you both happy. Lovingly, your Dad," etc.

With the foregoing invitation into the family of the plaintiffs in error, the defendant in error proceeded to her future home, going by way of New York. There she met Mrs. Nelson for the first time. What took place at this meeting in New York is disputed. The defendant in error says when she got into the room in the hotel, the elder Mrs. Nelson said:

"You don't look at all like I thought you would. I am disappointed in you; you are thinner and you are smaller, and you are not the girl I expected to see."

They slept in the same room, and the defendant in error says that when the elder Mrs. Nelson thought she was asleep, "she got up and went all through my suit case." They spent several days sight-seeing and at the theaters. They went home by way of Albany. In Albany they were joined by Romeyn. The elder Mrs. Nelson scolded her son for kissing his wife before he kissed his mother when they met at Albany.

The following circumstances are testified to in defendant in error's case from which the jury were asked to conclude that the defendant in

error had sustained her burden of proof: While at college the son was not permitted to write his wife unless he wrote his mother. The elder Mrs. Nelson "turned cold" towards her daughter-in-law for a long period of time, and on one occasion asked her when she was going home; that she wished she would pack her trunk and leave; and this was repeated thereafter. She told her daughter-in-law that she was "skinny," and came from "poor stock," and that was the reason she was not "fat," and that she "was tired of her" and "wished she would go home." When her son returned from college, after defendant in error had complained of the treatment of the elder Mrs. Nelson, she took her son "out of his wife's presence and they went away together and talked." The son expressed indignation at his mother's actions, and said that if his wife left he would "stick with her and go away too." The defendant in error testified that there were occasions in different towns when the two women were together when the elder Mrs. Nelson would point out pretty girls and compare them with her, and tell her son that she was ashamed of the defendant in error. In the early days the son protested against these references, stating that he was satisfied with his wife. On two different occasions the elder Mrs. Nelson accused her daughter-in-law of undue familiarity with the family physician. On the first occasion the plaintiff in error Thomas Nelson, was in the room, and supported the defendant in error. On a later occasion, he remained silent, indicating a change of feeling. On the first occasion the son became indignant, and on the second he raised his arm and said he felt like killing his wife. The first occasion was prior to an automobile trip to Boston, and the second was after the Boston trip. It was the theory of the defendant in error that much harm was done by the elder Mrs. Nelson in undermining the defendant in error in the affections of her husband on this Boston trip.

Upon his return from college, on one occasion, the elder Mrs. Nelson insisted upon Romeyn sleeping in a room other than the one occupied by his wife, and the husband refused. On another occasion she insisted on her son taking her to a motion picture show, and declining this pleasure to his wife. The father-in-law was present on this occasion, and he insisted that the son go and leave his wife at home. After their return the elder Mrs. Nelson spoke of how her son enjoyed the movies, and the son denied this emphatically. The elder Mrs. Nelson insisted that the door of the bedroom occupied by the young couple remain open. On one occasion a letter addressed to Romeyn Nelson was readdressed by the mother-in-law changing the "Mr." to "Mrs.," crossing off the name "West Pawlett, Vt.," and adding the words "Lincolnton, N. C., Box 285." The elder Mrs. Nelson told her son that he would have to do as she said or she would give all her money to his brother. After this talk, Romeyn came directly to the defendant in error and advised her of his mother's threat, and that she insisted on his going to Boston on the automobile trip, to which the son replied, 'Well, I will have to go. I will have to do as my mother says." The defendant in error says that the son "cried himself to sleep," and she was compelled to stay with "Grandmother Nelson" while they were gone on the automobile trip to Boston. Defendant in error was re-

fused the privilege of joining the party by the elder Mrs. Nelson. When they returned from Boston, the elder Mrs. Nelson did not greet ·her daughter-in-law except to say: "I was in hopes that you would be gone when I came back. You are still here." Romeyn said nothing. She accused her daughter-in-law of mismanaging the house, and of neglect of the dog in her absence. Defendant in error protested, and said that she did the baking, cooking, and general housework. This was the second occasion when the elder Mrs. Nelson accused her of undue familiarity with the family physician. Thereafter there was a conference between the parents and their son in the barn, which lasted for three or four hours, the defendant in error being left alone in the house. Directly after they came out, Romeyn came into the room and told the defendant in error that his father and mother decided that she must go home; that if he (Romeyn) did not send her home they would disinherit him, and their money would go to another brother. There were other acts of the elder Mrs. Nelson supporting this general conduct of hostility toward her daughter-in-law. As a witness, the elder Mrs. Nelson testified that she loved her daughter-in-law, and that "she loved her devotedly." But after she went home, having been sent, and leaving' New York on August 6 or 7, 1918, the elder Mrs. Nelson in no way communicated with her or endeavored to reunite the couple.

[1] We are satisfied from all the testimony that the elder Mr. Nelson latterly joined in the activities and statements of his wife. There was sufficient to present a jury question as to whether or not he was a joint tort-feasor. He was away most of the time on business, but was home a part of the time the defendant in error resided with them. He insisted on his son going to the movies with his mother, despite the remonstrances of the defendant in error, who was ill, and wished her husband to remain with her. Prior to the Boston trip the elder Mr. Nelson defended his daughter-in-law. After the Boston trip and the barn conference, when the elder Mrs. Nelson would scold or mock or find fault with the defendant in error, he no longer came to her defense. On one occasion, when it was thought that the defendant in error had retired for the night, but when in fact she was seated near by, she overheard a conversation between Mr. Nelson and his son in which he told his son that he was afraid he had made a mistake in marrying the defendant in error; that he should have married another girl—a rich girl; that he should get rid of her in some way or another. He took part in the conversation in the barn, which lasted for three or four hours, and after which the son delivered a message to his wife which resulted in her leaving the home of the plaintiffs in error. While his first letter was very solicitous indicating affection for his newly acquired daughter-in-law, when she left for her home in South Carolina he did not communicate with her except in a very businesslike manner. After she had written a number of letters to her husband showing great affection, and when she did not receive responses, she wrote to her father-in-law asking for the reason. The elder Mr. Nelson testified that, as far as he could see, his son loved his wife, and that he also loved her as a daughter-in-law, and that she exercised a wonderful

influence over his son. This seems inconsistent with his subsequent conduct after the separation. At one time thereafter she was ill in the hospital, and wrote a postal card to her father-in-law, and received no response. His subsequent conduct points strongly to his participation in sending her away and causing the separation. But one letter was written after the separation, and that on August 29, 1918, and, while he addressed her as "Dear Nellie," and excused himself for not replying before, said:

"So far as I can learn Romeyn has received your letters in due course, and apparently his feelings toward you is such that he does not wish to correspond with you. He is and has been well and is now planning to resume his studies in the course of a few days. Lovingly yours."

This letter would seem to negative the claim of love and affection he testified he had for his daughter-in-law.

There is no evidence of misconduct or unworthiness on the part of this young wife. She bore a good reputation, was of good character, and was well received by the new neighbors and friends she acquired in her new surroundings. Indeed the elder Mrs. Nelson testified that she was a girl of "beautiful, lovable disposition," and the elder Mr. Nelson said "she was always truthful and loyal." There is evidence of a neighbor who said she had a "sunny, sweet disposition, was lovable, industrious, and a good housekeeper."

[2, 3] There is, therefore, the absence of excuse for parental interference by advice or otherwise, as parents might give, without malice, if the case is one of a young wife's laziness, unworthiness, meanness of habits, or improper conduct with other persons, or a secret marriage against the wishes of parents, or where a child married into an objectionable social status. The defense denied much of what the defendant in error said as to the acts of the plaintiffs in error, and their speech and purposes. They say, in effect, that Romeyn sent his wife away of his own initiative, and that they loved her all the time. The case of the defendant in error rests upon the foregoing pieces of evidence, which, linked together, if believed, would justify the conclusion that they were wrongful acts resulting in the alienation of this wife's husband's affection. The threat of disinheritance, the scorn exhibited, the mockery of speech, the criticism of physical and personal appearance, and, finally, the finesse resulting in her return to North Carolina, together with the action for divorce in the state of Vermont, were enough to satisfy a jury of the truth of the charge and its effect upon this young couple. To have done all this went beyond the limits of parental advice given for the laudable purpose of promoting the welfare of their son or both. No reason is advanced by the plaintiffs in error why this young couple could not live together happily. No effort was made by advice or other helpful means by either of the elder Nelsons to reconcile this couple, and aid them in life's journey. If parental advice was permissible, it was, indeed to bring this about. Their actions are inconsistent with their declared professions of affection for the defendant in error. Instead, a jury found that they were actuated by malice, and that they attempted to free their son from the obligations of wedlock. Keeping their son under their roof, and by a constant course of conduct and en-

ticement, they destroyed the love of this young husband for his wife, and by an accumulation of derisions and the chilling of the young wife's efforts to please them succeeded in separating this couple. It was not long thereafter that suit for divorce was instituted. The law is well stated in Kliest v. Breitung, 232 Fed. 555, 146 C. C. A. 513, Ann. Cas. 1917E, 1014, that—

"Parents are justified in giving counsel and advice to a daughter who has contracted a marriage with a man who is believed by her father to be wholly unfitted to make her happy and to support her properly. If he acts without malice and is prompted by affection for his daughter and solicitude for her health and happiness, he cannot be held liable for alienation. In short, the law takes a practical common-sense view of such situations as are here disclosed; it recognizes the relation of parent and child as well as the relation of husband and wife."

In no case should a parent who has acted in good faith be mulcted in damages for advising, protecting, and sheltering a child who has contracted an ill-advised marriage with a man who is unable to support her properly. So, also, bad and unworthy motives cannot be presumed and ought to be positively shown or necessarily deduced from the facts and circumstances. Hutcheson v. Peck, 5 Johns. (N. Y.) 196, Chancellor Kent; Town of Fletcher v. Kezer, 73 Vt. 70, 50 Atl. 558. But direct evidence of a defendant's wrongful motive is not required, and the jury may be permitted to infer it from a defendant's words and actions proved by a plaintiff. And, where no acts are shown or attempted to be shown for the alienation of the husband's affection or his separation from the plaintiff, except false charges, the jury may properly infer such a defendant's acts and false charges are from bad motives. Cornelius v. Cornelius, 233 Mo. 1, 135 S. W. 65; Heisler v. Heisler (Iowa) 127 N. W. 823.

[4] The court below said, "Malice means a wrongful act done intentionally without just cause or excuse." And it is assigned as error that "this is misleading, and incorrect in an alienation case against parents," and it is asserted that "the charge therefore ran in a circle." This definition as given by the court finds support in the authorities. Zimmerman v. Whiteley, 134 Mich. 39, 95 N. W. 989; Fronk v. Fronk, 159 Mo. App. 543, 141 S. W. 692; Bagley, J., in Bronage v. Proser, 4 Barn. & C. 247. The criticism of this part of the charge presents no error. If there is evidence upon which the jury might have a right to find that the plaintiffs in error have actively interfered and caused their son to abandon his wife, and have deprived her of his affection and of the comfort and solace of his society, and have done this from motives of malice to the defendant in error, and not for purposes of affording proper protection to their child in furthering his true welfare, then the case must be left to the jury, with instructions that, if these facts be proved, the action is maintainable. Kleist v. Breitung, supra; Multer v. Knibbs, 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322, 9 Ann. Cas. 958; Bennett v. Smith, 21 Barb. (N. Y.) 439.

[5] We regard the evidence of participation on the part of both plaintiffs in error as a jury question under the proofs. We must not be unmindful of the fact that human experience of this kind, resulting in a broken home, results from an accumulation of efforts, stealthily

carried on. This disintegrating work may be resorted to with many subterfuges. A plaintiff may not produce the strongest kind of evidence to make out a case. A sulky mood, an insolent look, a gloomy manner, a constant derision and undermining of the affection of one for the other with malice, will accomplish the result, and will suffice in the necessity of legal proof. The fact that evidence is circumstantial does not impair its usefulness nor deprive it of potency. Direct evidence is, however, not indispensable. Circumstantial evidence is competent to prove conspiracy from the very nature of the case, and the rule which admits this class of evidence applies generally in civil and criminal cases.

[6-8] The gist of this action is the deprivation of the marital rights caused by the actions of the plaintiffs in error. Those rights may be classified as personal, that is, the society, affection, and companionship of the husband; the other, financial, that is, the right to be maintained and supported during his life in accordance with his rank and station. Because Romeyn and his wife lived together in New York on her way home, it is argued that the suit may not be maintained, but she had the right to continued aid, affection, and assistance of her husband. The fact that this couple were together on this occasion does not excuse the offenses of the plaintiffs in error which the jury has found deprived the defendant in error of the right of continuous society, affection, aid, and assistance of her husband. The jury has found that they conspired to separate the couple, and therefore each is a party to all acts done by the other before or after in furtherance of the common designs.

[9] It is argued that error was committed in admitting in evidence the result of the conference between the defendant in error and her husband after the family conference in the barn. This was received without objection or exception. The court on two occasions stated that this would not be evidence that it in fact occurred, but the evidence was admitted to show the state of mind of the husband. The court so instructed the jury in the charge. We see no error in the admission of this testimony for the purposes to which it was limited. We regard the trial as free from reversible error.

Judgment affirmed.

HOUGH, Circuit Judge (dissenting). There was error in admitting as evidence what the boy husband of plaintiff below told his wife of his parents' talk. One instance of this, adverted to in the majority opinion, was not objected to, but by that time objection was useless, for the court had earlier in the trial done the same thing on the ground that it was only admitted to show the state of mind of plaintiff's husband. Since that husband had filed a libel of divorce long before this action, that question was hardly in issue; but, had it been, error was nevertheless committed. The inherent nature of evidence cannot be changed by putting a label on it, and this hearsay tale is now the principal support of this verdict. But it is much more important that the record is wholly barren of any evidence against the father. A verdict of "too much mother-in-law" might easily be supported on plaintiff's story, but the father-in-law merely attended to business, for the most part away·

from home. Even plaintiff, in the letters she wrote after leaving her husband, and before bringing this suit, while expressing her feelings toward her mother-in-law with vernacular fluency, gives the father credit for affectionate kindness. He seems to have been mulcted by the jury for not keeping his own wife in subjection. That is no longer law, and I dissent.