MARJORIE M. PIERSON *vs.* BERDINA P. PIERSON.

Aroostook.        Opinion, April 10, 1935.

*Donald C. O'Regan,*
*A. S. Crawford,* for plaintiff.
*Ralph M. Ingalls,*
*John S. S. Fessenden,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, STURGIS, BARNES, THAXTER, HUDSON, JJ.

PATTANGALL, C. J.    On motion by defendant. Action for damages based on an alleged unlawful alienation of husband's affections by his mother. The rule governing such cases is well settled in this state. They may be maintained only when malice on the part of defendant is proved. We find no such evidence in this record.

Plaintiff and Boyd Pierson were married on July 7, 1933. At that time he was twenty-one and plaintiff twenty years of age. They first met in September, 1929, and not again until August, 1930. Three weeks later they became engaged and planned an immediate marriage but were obliged to abandon the idea because of inability to procure licenses on account of their respective ages. In December Boyd went to California where he remained until March, 1931, when the engagement was broken and their intimate relations were not resumed until November, 1932. Before Christmas, Boyd left for Portland after giving plaintiff a diamond en-

gagement ring and, as she went to Toronto before Boyd returned, they did not meet again until April, 1933. In May of that year, plaintiff became pregnant and about the time of their marriage an abortion was procured. It is to be noted that they had seen but little of each other prior to the marriage, although they had carried on an intensive correspondence during a portion of the time.

Defendant first learned of the marriage in September. Prior to that time, Boyd, having left the University of Maine on account of failure to pass examinations, had planned to attend college in Alabama, intending to pursue a course of study which would fit him to enter a medical school. Plaintiff was employed as a telephone operator and was to continue in that employment. In order to do this, the marriage was to remain secret as married women were not eligible for the work in which she was engaged.

After a conference between plaintiff, defendant, Boyd and his father, defendant and Boyd went to Alabama, remaining there about two hours, just long enough to find that he could not be admitted to the school. They then proceeded to Duke University, staying there two days, admission being again refused. In about a week they arrived at his home, and the next day Boyd returned to the University of Maine where he remained until the Christmas holidays. After a short visit at his home, he again returned to Orono, staying there until March, when, having succeeded in gaining admission to Duke University, he went there, staying until May. At that time he came north, writing plaintiff from Portland, and in June decided to apply for a divorce and so notified her.

During the Christmas vacation in 1933, Boyd informed his parents of plaintiff's pregnancy and the abortion, which so incensed plaintiff that her attitude toward Boyd entirely changed, as admitted by her and evidenced by the tone of the letters which passed between them.

Plaintiff testified that during 1934 Boyd did not write as often as formerly nor as long letters; that when he returned to Maine in June, he was apparently not as affectionate as he had been; and that on June 14th she recorded her marriage certificate and lost her employment. On the 19th, Boyd and defendant met plaintiff at her sister's, and left for Portland without any arrangements having been made for the future. They did not meet afterwards.

A great deal of evidence was submitted which had no bearing upon the issues which the jury was called upon to decide. The details of a trip which Boyd made to California prior to the marriage were gone into at great length. One hundred forty-six pages of the record, filled with letters written to plaintiff by Boyd prior to their marriage, possessed no evidence value whatever. The personal history of plaintiff from her childhood, the comparative poverty of her family during her early life, long before she became acquainted with Boyd, were dwelt upon at considerable length. This mass of inadmissible testimony may well have tended to confuse the jury and to obscure the issues. The letters may have worked prejudice against Boyd, and the feeling thus engendered may have been unconsciously related to defendant. They were not models of epistolary art. They breathed passion, teemed with vulgarity, and contained evidence of a somewhat sadistic frame of mind.

In cases of this sort, it is always difficult for triers of fact to separate the real defendant and the husband or wife appearing as a defense witness. Whatever the cause of the verdict, it has no legal basis.

The situation was not uncommon, although distressing. An immature son, not yet out of school, in fact apparently incapable of staying in any given school very long, with no means of his own and without earning capacity, married without the knowledge or consent of his parents. On the eve of his starting for a southern college, the mother learned of the situation and, realizing as would have any person with common sense, that under the circumstances the marriage was most ill-advised, suggested annulment. This idea was abandoned as impracticable, and an understanding was reached that plaintiff would continue at work for the telephone company, which necessitated keeping the marriage secret, and that Boyd at his father's expense should acquire the education which had been planned for him. Neither defendant nor her husband were under any obligation to support plaintiff. In fact, after Boyd reached his majority, neither was obligated to support him. Defendant did not seek intimacy with plaintiff; but, on the other hand, there is no evidence that any hostility was displayed by the mother-in-law toward her.

Plaintiff made an unfortunate marriage. Given the factors present in this case, its failure was predestined. Boyd Pierson was totally unfitted to assume the responsibilities of a husband and a father. His mother knew it and doubtless was greatly exercised. If she and her husband felt that it was unwise for the young couple to live in too close connection, it may have been because they preferred not to become grandparents until Boyd had, at least, finished wandering from school to school, ostensibly endeavoring to prepare himself for a professional career. They declined to assume the expense of providing a home for Boyd and his wife in either of the college towns in which he temporarily resided. In this, they were quite within their rights.

Aside from such inferences as might be drawn from admitted facts, plaintiff relies upon her own evidence to prove malice on the part of defendant. Her testimony in that respect fails to substantiate the charge.

Certain evidence was emphasized as tending to show an antagonistic attitude of defendant toward plaintiff. Among other things relied upon was a letter from Boyd to plaintiff, written in September, 1933, while on his way South with his mother. The quotation from the letter is: "Mother hasn't said much. It seems that they don't think that you are the right girl for me. Now, dear, don't repeat any of this to anyone. If you do, I'll know that you don't love me. They are willing to have it proven to them that you are the one and they are hoping that you are. It has rather broken Mother up. She says that it is going to break Aunt Bertha's heart as I am the nearest to a son that she has ever had."

Plaintiff testified that when her husband and defendant were leaving for Alabama, "Boyd wanted me to say goodbye to his mother. He also asked me to kiss her goodbye and she turned her face away. Boyd told his mother not to be foolish and then she leaned over and kissed me."

She also testified that when Boyd came home for the Christmas holidays in 1933, he had agreed to spend Christmas Day with her but instead spent it at Presque Isle. There was nothing to indicate, however, that defendant had anything to do with Boyd's action in that respect. Both plaintiff and defendant met Boyd at the railroad station Christmas evening, riding down in the same taxi, not

by appointment but by accident. Plaintiff said that they spoke when they met in the taxi but neither spoke to the other in the station while waiting for the train to come in. The three rode in the taxi from the station to defendant's house, arriving there about ten o'clock. At this time, Mrs. Pierson again suggested an annulment of the marriage, that Boyd go to school, and later on, if he still wanted to be married, she would consent to it.

Plaintiff was asked, "Was Mrs. Pierson courteous and kind to you in her home?" Plaintiff answered, "Yes." Her counsel was evidently dissatisfied with the answer and put the question, "She was?" and again plaintiff answered, "Yes."

The final result of this interview was that plaintiff would go on working for two years, keeping the marriage a secret, and at the end of that time Boyd would support her.

It was a stormy night and Mrs. Pierson invited plaintiff to remain at the house, but she declined and went to her sister's with whom she lived.

Plaintiff testified further that they (meaning Boyd's father and mother, herself and Boyd) talked for some time that night; that the parents told them that they had been very foolish children; that it was only a case of child love; and that the wiser thing to do was to have the marriage dissolved in some way, which plaintiff and Boyd refused to consider.

In answer to the question, "Did anything happen at Christmas time in 1933 that made you dislike Boyd?" she answered, "Yes"; and also admitted that after that time she ceased to write to him frequently, and told him in one letter that she had hopes of getting along splendidly with his family but that he had spoiled it all, referring to the information he had given his people concerning her pregnancy prior to their marriage; that after that time she never sent her love to Boyd, and that on one occasion it was a month and a half before she acknowledged a letter from him; that Mrs. Pierson never talked unkindly to her; and that there was nothing excepting the talk which Boyd had with his parents at Christmas time which caused trouble between her and her husband.

She testified that on April 9, 1934, she wrote him, asking him if he wanted a divorce, and that it was possible that she had written him "our marriage ought to be annulled. Your mother is right."

Later she admitted that she had an idea that the marriage ought to be annulled, and that she had written him, comparing him to another young man she used to know, who was able to support a wife. There is very little that was material in the testimony of supporting witnesses called by the plaintiff.

It is unnecessary to consider the evidence for the defense, as the plaintiff is entitled to hold the verdict if, on the most favorable presentation of her case, it can be justified in law. We do not find such justification.

The law has always recognized a broad distinction between the permitted attitude of parents toward their married children in connection with their domestic relations and the attitude which may properly be taken under like circumstances by strangers.

A parent is liable for any wrongful alienation of the affections of a married child, but only when the parent's conduct is malicious. It is incumbent upon the plaintiff to prove malice on the part of the defendant. Liability attaches only when the parent interferes with hostile, wicked or malicious intent. If she acts in good faith for the son's good on reasonable grounds of belief, she is not liable. *Oakman* v. *Belden,* 94 Me., 280, 47 A., 553; *Wilson* v. *Wilson,* 115 Me., 341, 98 A., 938; *Shalit* v. *Shalit,* 126 Me., 291, 138 A., 70; *McCollister* v. *McCollister,* 126 Me., 318, 138 A., 472; *Miller* v. *Levine,* 130 Me., 153, 154 A., 174.

A suggestion that a marriage ought to be annulled or that it would be wise for the parties to become divorced is not evidence of malice on the part of the parent. "To the parents this ill-advised marriage may well have seemed the end of their daughter's happiness and they would have been less than human if they had not given expression to their resentment at the sudden termination of the ambitious career they had probably marked out for their daughter." *Kleist* v. *Breitung et al,* 232 Fed., 555.

Plaintiff did not succeed in establishing by a preponderance of testimony malice on the part of the defendant. The burden of proof was on her to do so.

*Motion sustained.*