SMITH v. SMITH.

1. HUSBAND AND WIFE—ALIENATING AFFECTIONS OF WIFE—MALICE —PARENT AND CHILD.

Interference by a stranger with the affections of the husband or wife is presumed to be malicious but parents and near relatives are not affected by so strict a rule, and their malice must be affirmatively shown.

2. SAME—EVIDENCE—DISLIKE.

It is sufficient to show malice in a suit for alienation of affections, that parents interfere with the domestic relations of a son or daughter simply to gratify their dislike or hatred of the other party to the marriage.

3. SAME—EVIDENCE—COMPETENCY.

Where plaintiff's husband was induced to leave her and withdraw his affections from her by the conduct or solicitation of his mother and sister, which they purposely in-

tended to have that effect, and they denied the alleged conduct but did not attempt to justify their action, it was competent to show ill will and dislike existing between the relatives and the wife.

4. SAME—DAMAGES.

A verdict and judgment of $12,000 for alienation of the affections of plaintiff's husband, *held*, too great, upon a review of the testimony, and reduced on error to $6,000, or the judgment reversed unless plaintiff remit.

Error to Genesee; Withey, J., presiding. Submitted October 20, 1915. (Docket No. 164.) Decided September 26, 1916.

Case by Grace Smith against Mary Smith and another for the alienation of her husband's affections. Judgment for plaintiff. Defendants bring error. Reduced and affirmed, conditionally.

*Brennan, Cook & Gundry* and *Harrison Geer,* for appellants.

*Farley & Selby,* for appellee.

PERSON, J. This action was brought by the wife against the husband's mother and sister, and charges them with alienating his affections from her, and with causing him to abandon and leave her. Plaintiff and her husband, Henry Smith, were married on the 12th day of August, 1908, and lived together as husband and wife in the city of Flint until about the last of October, 1914, a period of something more than six years. During that period two children were born to them, Lucille in June, 1911, and Doris in May, 1913. Plaintiff and Mrs. Travis, the sister, appear never to have been on very friendly terms; and from plaintiff's testimony the fault lay entirely with the sister. Plaintiff's relations with the mother, Mrs. Mary Smith, were

evidently somewhat better, and these two were on fairly friendly terms, most of the time, down to August, 1914, when, in an altercation over plaintiff's older child, the mother assaulted plaintiff and struck her several blows. But it may be fairly inferred that from the beginning both the mother and the sister looked upon the marriage with disfavor, and as somewhat beneath the social standing of their family. The conduct of the two, however, was marked with this difference, that the mother, for a time at least, apparently tried to make the best of what she considered an unfortunate alliance, while the sister never attempted to conceal her dislike of the marriage, and of plaintiff for having presumed to become a member of the family. In thus characterizing the attitude of the mother and sister we are accepting as true the story told by plaintiff, as we must do on this appeal, inasmuch as it was unquestionably accepted and found to be true by the jury.

The record includes somewhat in detail a history of the relation of the parties from the date of the marriage, and gives a number of incidents showing the way in which plaintiff was treated by the mother and sister. Immediately following the marriage plaintiff and her husband took a trip up the Lakes, and during their absence the mother fitted up and furnished a house for them to live in. From their return they occupied this house until some time in the following winter, when the husband sold it. At the time of the sale the mother and sister were in Europe, having gone there in November following the marriage, and the husband, with plaintiff, moved into the mother's house, where they remained until the mother and sister returned during the following February. The sister at this time was unmarried and lived with the mother. Just when her marriage took place is not clear from the record, but she apparently still continued to live

with the mother, even after her marriage. While in Europe the mother wrote various letters to her son, Henry, plaintiff's husband, two of which were read in evidence by plaintiff's counsel. In one of these, after suggesting plans for a house which it was expected the husband would build for himself and plaintiff, occurred the following passage:

"I think you better rent a small house for the summer, for, no matter how much we should enjoy having you with us, a daughter-in-law is different. You remember the old saying, 'No home is big enough for two families.' Do you think Grace would prefer going to her mother's until the house is done, and you stay with us rather than to move again? If you commence to look about now, maybe you could find a nice little house. Now if you want the barn, I will give you it all as it now stands. Then you could take your own money and finish it as you liked, but we want to help you, as we think we have taste, you see."

And in the other letter the mother said:

"I hope you have a house secured by the first of March or before; if not, Grace better stay with her mother between times. You can understand how hard it would be for us to live together until you get your house. I don't mean you, dearie. It would be a joy and delight to have you, darling, always with us. You could store your furniture in what we used to call the old music room, or where you now sleep until you moved. * * * Burn up this letter and don't let Grace see it, of course."

According to plaintiff's testimony, the feeling towards her disclosed by these letters was immediately acted upon when the mother and sister reached home from Europe. They had not removed their wraps, she says, before the sister suggested that plaintiff at once leave their house and go to her own mother's. With this suggestion of the sister, the mother, plaintiff says, fully concurred. But it seems that plaintiff at the time was not sufficiently offended to leave the house

at once as suggested. For a year after this plaintiff seems to have got along pleasantly with the mother, who, she says, was kind to her, and fairly well with the sister, except for occasional insulting remarks by the latter. During this time her husband built a house into which they moved and continued to live until June, 1914. This house was on the mother's lot in the city and within a short distance of her house. In 1914 the first real difficulty took place. Plaintiff had employed a woman to assist in some heavy work about the house, and the mother found fault with her for doing so, and expressed to plaintiff the opinion that the latter was able to do her own work. This altercation took place in plaintiff's house, and before it was concluded the sister, who had been called in by the mother, took occasion to say that plaintiff was "a poor working girl," a "Mt. Morris pauper," and a "liar," and to accuse her of wearing old clothes that the sister had furnished. Both the mother and sister expressed their sympathy for "poor Henry," and the mother informed plaintiff that whatever had been done for them was on Henry's account, and not for plaintiff. From this time on plaintiff and the sister were never on speaking terms, and never did speak to each other, except on the occasion of the assault and battery, which will be mentioned later, and, perhaps, on one other occasion when some trouble occurred. With the mother it was somewhat different. She and plaintiff kept away from each other for something over a year, although living upon the same lot, but when plaintiff's first child was born, in June, 1911, the mother went to see her, and from that time until the assault and battery in August, 1913, a period of more than two years, the mother and plaintiff were on friendly terms. The evidence shows, however, that even during the friendly periods which preceded the unfortunate assault committed by the mother

upon plaintiff, almost exactly five years after the latter's marriage, there were a number of incidents tending to show a feeling of conscious superiority on the part of the mother, and that her acts of kindness came more from a condescending toleration than from sympathy and respect. She was continually directing plaintiff how she should dress, where she should put her household furniture, and the way her rugs should be arranged. The mother also frequently invited her son, plaintiff's husband, to meals, especially to breakfast, without inviting plaintiff, and at one time set workmen to cementing the cellar of plaintiff's house without consulting plaintiff about it. Finally, and on August 8, 1913, the relation of the parties reached its climax. This was about three months after plaintiff's second child was born. On that day plaintiff's older child awakened from her sleep crying, and continued to cry quite loudly for some time. Its grandmother— that is, the defendant Mrs. Smith—finally went over to plaintiff's house to inquire as to the cause. One word led to another until the grandmother, defendant Mary Smith, then some 70 years old, assaulted plaintiff and struck her twice and scratched her face and arms until they bled. Then the other defendant, the husband's sister came in, and further angry words followed. As defendants were leaving, Mrs. Smith turned to plaintiff and said: "Now, we will get Henry; we will get rid of you." And her daughter, the other defendant, added: "Yes, mama; we will get rid of her, now; we will fix her now." And this they repeated several times. This description of the affair is, of course, according to plaintiff's version of it. The defendants told a somewhat different story, but the assault and blows were not disputed.

It is plaintiff's testimony that up to the time of this assault upon her, Henry, her husband, had been very kind and affectionate towards her, and that she had

considered him an ideal husband, but that after the
assault, and the threats by defendants, his manner
changed, and he became morose and sullen, and stayed
away from home more and more as time went on. It
is evident, too, that her attitude towards the husband's
mother changed from the time of the blows. It is her
testimony that before the assault she had never said
anything about his mother in the presence of her hus-
band, and the implication is that she did express her
mind about the mother somewhat freely after the as-
sault. She not only expressed her mind, but in March
following began an action against the mother in the
circuit court to recover damages for the assault and
battery, and pushed the action to a substantial judg-
ment in May, 1914. 185 Mich. 172 (151 N. W. 647).
This action was evidently a constant source of trouble
between plaintiff and her husband. She admits in her
testimony that he was offended because she began it
and persisted in maintaining it. One of the nurses
employed by plaintiff at the time says that the hus-
band appealed to her, and asked that she use her in-
fluence to induce plaintiff to discontinue the action.
And it is shown that he offered to purchase a house
farther away from his mother if plaintiff would drop
the litigation. Plaintiff, however, was obdurate, and
his efforts to keep the matter out of court, or get it
out of court, were unavailing. And at the trial he sat
by his mother and sister, plaintiff says, and gave them
his assistance, or, at least, the moral support of his
sympathy. But plaintiff's prosecution of the action
against the mother for assault and battery does not
seem to have so seriously impaired his affections for
her. That action went to judgment in May, and during
the June following he rented a cottage for plaintiff at
Lake Orion, where she stayed with the children until
the last of the following August. While she was at
the lake her husband lived all, or most, of the time,

with his mother and sister, but he visited plaintiff regularly twice a week, and she says that he treated her very nicely. When plaintiff came back from the lake, she declined to return to their home near the mother's residence, and, with her husband, moved into a house on Avon street. From this time the two grew more and more apart, until about the last of October, 1914, when, as has been said, he refused longer to live with or support her. On the 9th day of November plaintiff began a suit for divorce, to which the husband filed a cross-bill, praying for the same relief. And on the 18th of November she began this action, in which she recovered a judgment for $12,000, and costs.

The evidence has been set out in full because it was the contention of defendants in the court below, and is their contention here, "that there was no competent testimony offered and received in evidence that would entitle plaintiff to recover."

It was five years, lacking a few days, from the time of the marriage, down to the date of the assault and battery committed by the defendant Mary Smith upon the plaintiff. The various instances related by the latter as having occurred during those five years were, no doubt, very disagreeable and annoying to her, but they do not tend to show any design or attempt on the part of defendants, or either of them, to separate her husband from her, or to alienate his affections. Very much was apparently made by counsel for the plaintiff of the letters written to the husband from Europe, but there is no duty on the part of a husband's parents to take his wife into their home, or to expel the husband, their son, from it. Tactfulness and good sense might suggest the suppression on the part of parents and relatives, of their disapproval of a marriage contracted by a member of the family, but they are not under any legal duty to conceal such disapproval. The husband's sister was spiteful and insulting, if plaintiff's

story is true, but the mother, while officious and overbearing, seems, for most of the time at least, to have tried to make the best of what she considered an unfortunate alliance. For the larger part of the time, down to the assault, she seems to have been on fairly good terms with plaintiff. And until that unfortunate and reprehensible event the husband's affection for plaintiff seems not to have been lessened or impaired. Plaintiff herself says that, until the assault, she considered him an "ideal husband."

But while testimony as to events preceding the assault has no tendency to show a design on the part of defendants to disrupt the affectionate relations between plaintiff and her husband, it yet was competent in the case as showing defendants' attitude of mind towards plaintiff, and a motive for alienating the husband's affections, if defendants did intentionally alienate his affections after the assault and battery; for, while any interference by a stranger with the husband's or wife's affections is presumed to be malicious, it is different with parents and near relatives, and their malice must be affirmatively shown. *White* v. *Ross,* 47 Mich. 172 (10 N. W. 188) ; *Rice* v. *Rice,* 104 Mich. 371 (62 N. W. 833) ; *Zimmerman* v. *Whiteley,* 134 Mich. 39 (95 N. W. 989) ; *Hutcheson* v. *Peck* (N. Y.) 5 Johns. 196; *Beisel* v. *Gerlach,* 221 Pa. 232 (70 Atl. 721, 18 L. R. A. [N. S.] 516) ; *Oakman* v. *Belden,* 94 Me. 280 (47 Atl. 553, 80 Am. St. Rep. 396) ; *Baird* v. *Carle,* 157 Wis. 565 (147 N. W. 834). And malice is established whenever it is shown that parents have interfered with their son's or daughter's domestic relations simply to gratify their own dislike or hatred of the other party to the marriage. *Holtz* v. *Dick,* 42 Ohio St. 23 (51 Am. Rep. 791) ; *Brown* v. *Brown,* 124 N. C. 19 (32 S. E. 320, 70 Am. St. Rep. 574) ; *Jones* v. *Monson,* 137 Wis. 478 (119 N. W. 179, 129 Am. St. Rep. 1082). In the instant case, if plaintiff's husband

was induced to leave her and to withdraw his affections from her by the conduct or solicitations of defendants, purposely directed towards that end, then it must be held that they were actuated by malice; for no other motive is shown on their part than ill will towards and dislike for plaintiff. Indeed, their defense is a denial of such conduct, not a justification of it. It was therefore competent to show such ill will and dislike. And it was also competent to show the various declarations of the husband as tending to prove his state of mind towards plaintiff.

And this leads to the vital question whether there was any proof that defendants, after the assault, were instrumental and effective in depriving plaintiff of her husband's affections. It is true that there is no direct evidence of anything said or done by them to influence his conduct. It is also true that plaintiff offended him by bringing and maintaining the action against his mother for the assault and battery. Yet this proceeding by plaintiff does not seem to explain his final abandonment of her, inasmuch as the proofs are undisputed that following her judgment against the mother for the assault and battery he hired a cottage for plaintiff at Lake Orion, visited her frequently there, and conducted himself towards her in an affectionate manner. And the jury, in view of the instructions from the court, must have found expressly that the action for assault and battery was not the effective cause of his estrangement. On the other hand, although there is no proof of any particular thing done or said by defendants, we have the established facts that the husband was with them more or less nearly every day; that neither one of them ever spoke to plaintiff after the assault; that the mother was bitter enough towards plaintiff to strike her in her own house; and that both the mother and sister threatened to accomplish the very thing that happened. At least

the language used by them, on the occasion of the assault, was easily susceptible of that interpretation. The weight of all of these circumstances and the inferences to be drawn from them were peculiarly within the province of the jury, and we do not feel able to say that there was no evidence upon which they could base their verdict in the plaintiff's favor. This is not one of those cases that turn upon the motive of a parent or relative in causing an alienation. Rather, it turns upon the very fact of the alienation itself, and their part in it. And there is some evidence that it came about through their active interference following the assault.

But we think the amount of the verdict excessive. It was not in its nature susceptible of mathematical computation, and rested necessarily on the judgment and discretion of the jury. There was much in the case to excite their sympathies and to create a feeling of dislike toward defendants. The evidence as to the assault and battery was a legitimate part of the case, but damages for that wrong had already been awarded. It is to be feared, however, that it had its effect upon the amount given in this case, although the jurors themselves might not have been conscious of its influence upon their minds. Neither was it permissible for the jurors to give damages for the insults to, and impositions upon, plaintiff during the five years preceding the assault, inasmuch as the conduct and language of the defendants at that time was not accompanied, so far as the evidence shows, with any intent to alienate the husband's affections. Yet, from its amount, all of these things undoubtedly had a part in the making up of the verdict. For these reasons we think the trial judge should have granted a new trial on the motion made therefor, unless the plaintiff was willing to remit from the verdict all above the sum of $6,000. And such an order will be made here, and

the judgment will be reversed, with costs, and a new trial granted, unless plaintiff remits from such judgment all that portion thereof above the sum of $6,000. But upon the plaintiff executing and filing the proper papers remitting said excess, the judgment will stand affirmed, with costs to the appellants.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred.