[Civ. No. 8420. Second Appellate District, Division Two.—March 28, 1935.]

EMORY L. SMITH, Respondent, v. EARL L. KIGER, Appellant.

J. Vincent Hannon, Wm. F. McLaughlin, Bernard L. Herlihy, Oscar Lawler and Patrick F. Kirby for Appellant.

S. S. Hahn and W. O. Graf for Respondent.

SPROUL, J., *pro tem.*—The defendant, Earl L. Kiger, is the father of plaintiff's wife, and is sued for recovery of damages on account of the alleged alienation of the wife's affections. The action was brought against both Mr. and

Mrs. Kiger, but at the close of the evidence a motion for non-suit was granted in favor of Mrs. Kiger; hence she is not a party to the judgment, nor is she a party to this appeal. This case was tried before a jury, and upon the verdict of the jury a judgment was rendered against the defendant, Earl L. Kiger, in the sum of $10,000. From this judgment defendant appeals.

The plaintiff, Emory L. Smith, and Mildred Moiso Kiger, the daughter of the defendant herein, were married in the city of Ventura on the twenty-first day of September, 1929. The defendant Kiger, together with his wife and two daughters, Mildred and Marian, resided in Los Angeles prior to said marriage.

Mr. and Mrs. Kiger knew of plaintiff and that he had shown some attention to their daughter. Mrs. Kiger hardly knew plaintiff and had never talked to him one hour in all their acquaintance before the marriage of her daughter. Prior to the marriage, plaintiff had called at the home of defendant several times and had often telephoned Mildred. It does not appear from the record herein that the father, Mr. Kiger, had ever seen plaintiff prior to September 21, 1929, the date of the marriage. The plaintiff's wife testified it was the plan to keep the marriage secret until her husband was able to support her, which would be about the first of the year 1930. She was to live at home with her parents and plaintiff was to live apart from her with his parents. Plaintiff's wife, while on her trip to Ventura to be secretly married, testified that she was then beginning to feel rather cheap about the secrecy of their marriage but went through with it. After the marriage she testified she regretted it more so, and thought how wonderful her folks had been to her and how inconsiderately she had treated them by being secretly married. Two weeks after her marriage the plaintiff's wife was advised by a friend, one Mrs. Sanders, to consult an attorney in Long Beach regarding an annulment or divorce. The attorney reported that neither could be obtained.

The wife continued to live with her parents and the husband with his folks. The husband did not call at the home of the wife's parents after the marriage until December 8, 1929, but met his wife on downtown streets of Los Angeles

and took her for a drive about twice a week. On returning from drives, plaintiff formed a habit of letting his wife out a couple of blocks from home so she could tell her parents she had been out to dinner or had gone to a show with a girl friend.

Some time in September or October, 1929, defendant met the plaintiff on the street and told him that he did not approve of plaintiff's taking his daughter out for long hours, and that he should confine himself to three or four hours at a time. Some time later, before the defendant learned of the secret marriage, he again met plaintiff near his home, told him he did not see any future in him and was not favorably inclined toward him as a suitor for his daughter's hand, and limited plaintiff's calls to every three weeks. Plaintiff at no time revealed the marriage, but did state that he was in no position to get married and that there was no need to worry at all.

In October, 1929, while ignorant of the marriage, defendant wrote plaintiff a letter asking him to absolutely discontinue phoning or calling on his daughter.

The secret marriage continued to worry the daughter, and on November 30, 1929, when she was confined to her home with illness, Mrs. Sanders, to whom she had previously confided her marriage, called at the home of the defendant and informed Mrs. Kiger, the mother of plaintiff's wife, that her daughter was married to the plaintiff. Mildred's mother became highly hysterical and collapsed. About a half hour later the defendant arrived and Mrs. Sanders informed the defendant that his daughter Mildred was married. This was on November 30, 1929, about one month after defendant had written to plaintiff telling him to discontinue calling on his daughter or phoning her. There is no evidence in the record that the father had any knowledge of this marriage prior to November 30, 1929. Mrs. Sanders spent the night at the Kiger home and was driven home the following Sunday afternoon.

When the father confronted Mildred with the marriage and wanted to know what she intended to do about it, Mildred's answer was: "I don't know. I am sick and I don't care." Mildred's father testified that her mother had completely collapsed, and she suggested that she and her

mother, in order to get away and have a little rest, take a boat trip to San Diego.

On December 5, 1929, the mother and daughter left on a boat trip to San Diego and returned December 10, 1929. Before leaving, plaintiff's wife gave instructions to her father and younger sister, Marian, who remained at home, to tell no one where she was, and at the same time she told her father that she had been trying to secure a divorce or annulment from her husband.

On December 7, 1929, the plaintiff ascertained that his wife was not working at the usual place and telephoned the Kiger home. He was informed by Marian that Mildred was not in, but plaintiff apparently was not satisfied and made several more telephone calls, but was again told that Mildred was not in but would be in later.

Sunday, December 8, 1929, accompanied by two witnesses, plaintiff called at the Kiger home and after a short conversation, in which defendant used some profanity and harsh language toward the plaintiff, defendant ordered the plaintiff off the premises. However, before leaving the premises plaintiff was given permission to look through the house, but did not find his wife.

Defendant, when called under section 2055 of the Code of Civil Procedure, contradicted plaintiff's testimony in many particulars. In substance, defendant denied that he saw an attorney or was ever present in any attorney's office with his daughter, Mildred. Defendant further stated that he heard a divorce was filed by his daughter against the plaintiff but he had nothing to do with it and paid no attorney whatsoever. Defendant said that plaintiff did not say that he loved Mildred or ask defendant not to interfere with their relations. Defendant added that he assisted plaintiff to the door and told him to get out and stay out, and that plaintiff said, "All right, old dear". Defendant also testified that he told his daughter: "You are married, and you can either go to your husband or stay at home."

Defendant met his wife and daughter at the railroad station when they returned from San Diego and informed them that plaintiff was on a rampage and requested his daughter to tell the plaintiff to call at the Kiger home. Plaintiff came to the Kiger home and, according to the de-

fendant's version, he got the young couple together and told them he would have nothing to do with their affairs, and that they would have to settle their difficulties between themselves. The version is corroborated in the record by plaintiff's wife and Mrs. Kiger. The plaintiff's version varied slightly with the above testimony.

Plaintiff and Mildred continued to live separate and apart. However, they did go out and look for a house to rent, but for financial reasons found no suitable home.

Certain other facts here merit notice, in that plaintiff's wife testified she never knew what salary her husband was making—that he never told her. She further testified that she was not even working at that time and tried to make him understand why it was utterly impossible to start out housekeeping; that plaintiff accused her folks of interfering, which was entirely untrue. In a later conversation Mildred told her husband she would not live with him until he had something set aside to take care of illnesses, unemployment or emergencies. Mrs. Smith further told her husband, the plaintiff herein, that he could not support her and that it would simply be suicide for them to attempt to go out and live together then, and that it would be foolish and disastrous; that they could not make it go; that they should have at least one thousand dollars to fall back on; that plaintiff agreed and at his request his wife, Mrs. Smith, wrote and signed a little memorandum to that effect, which writing the plaintiff, however, denied; but the plaintiff's testimony and his letters to Mildred clearly prove the agreement.

Plaintiff and his wife continued to correspond for several months thereafter.

Indeed, it seems to be the attitude on the part of plaintiff's counsel that the parents sought to alienate the wife from plaintiff and that she refused to live with him. That is not a fair legal inference, and it finds no support in the testimony or letters introduced in evidence.

As has been suggested by plaintiff's counsel, there is some testimony of profanity and harsh language, likewise unfriendly comment by the father when plaintiff told him for the first time he had married his daughter, but this stand-

ing alone and in view of what took place thereafter, can hardly he said to support the verdict.

Further testimony by the defendant when called under section 2055 of the Code of Civil Procedure did not prove any attempt of alienation whatsoever. Defendant related the story heretofore set out of what occurred when plaintiff called at defendant's home while plaintiff's wife and her mother, Mrs. Kiger, were in San Diego; but plaintiff introduced no evidence to show that either defendant or Mrs. Kiger ever made any attempt by conversation or action to alienate their daughter's affections or to influence her intention or behavior toward her husband, the plaintiff herein. No witnesses testified that the defendant ever made any statements or remarks to his daughter that were derogatory to plaintiff, or that he ever exercised any coercion, menace or restraint upon her whatsoever. Certain other facts should be added to complete this narration.

On July 2, 1930, Mildred went with her parents to Warner Hot Springs to spend the Fourth of July. After returning she went to Yosemite with her younger sister. Just before the trip to Warner Hot Springs plaintiff met his wife on the sidewalk near her home, at her request, and took her for a drive to the beach, where she had a pleasant visit. The husband voiced no objections to the trip to Warner Hot Springs, except that he told his wife he wished she would stay with him. Before Mrs. Smith returned from her trip to Yosemite plaintiff filed suit against his wife's parents for alienation of his wife's affections.

The marriage was entirely unknown to the father until he heard it from Mrs. Sanders, November 30, 1929, more than ten weeks after the secret marriage had taken place.

■ It is settled law that a father has a right to forbid a prospective suitor to call upon his daughter and is under no obligations whatsoever to allow one of whom he does not approve as a prospective husband to enter his home. Without knowledge of the marriage there can be no liability for alienation of affections (see *Newson* v. *Howley,* 205 Cal. 188 [270 Pac. 364.]).

■ Plaintiff testified to numerous conversations with his wife, in which she stated, according to his testimony, that her parents were opposed to him and were trying to keep

the young couple apart, but this evidence was not competent to prove anything other than the state of the wife's affections and was admitted only for that purpose.

The plaintiff cannot rely upon hearsay testimony, however effective it may have been with the jury.

There is nothing in the record from which malice can be either inferred or presumed. The law on this subject is well settled. Whatever may be the rule as to the position of a stranger who shelters or counsels a wife, that rule does not apply where the parents of one of the parties are concerned. ▮ In such cases every presumption is that the parent acted with the best interest of his child in view, and malice must be affirmatively proven. (See *Hall* v. *Hall,* 174 Cal. 718 [164 Pac. 390]; *Bourne* v. *Bourne,* 43 Cal. App. 516 [185 Pac. 489]; *Kleist* v. *Breitung,* 232 Fed. 555; *Young* v. *Young,* 8 Wash. 81 [35 Pac. 592]; *Crowell* v. *Jeffries,* 79 Ind. App. 513 [134 N. E. 908]; *Hutcheson* v. *Peck,* 5 Johns (N. Y.) 196; *Wilson* v. *Wilson,* 115 Me. 341 [98 Atl. 938]; *McLery* v. *McLery,* 186 Wis. 137 [202 N. W. 156]; *Ward* v. *Ward,* 102 Okl. 24 [225 Pac. 964]; *Birchfield* v. *Birchfield,* 29 N. M. 19 [217 Pac. 616]; *Trumbull* v. *Trumbull,* 71 Neb. 186 [98 N. W. 683, 8 Ann. Cas. 812]; *Barton* v. *Barton,* 119 Mo. App. 507 [94 S. W. 574, 583]; *Cripe* v. *Cripe,* 170 Cal. 91 [148 Pac. 520]; *Noll* v. *Carlin,* 101 Or. 203 [199 Pac. 596]; *Smith* v. *Smith,* 192 Mich. 566 [159 N. W. 349].)

▮ Where the determination of the wife to abandon her husband was the result of her own volition and not influenced by any wilful or malicious act of the father, the latter cannot be held responsible because he assisted her in carrying out her purpose and no presumption of a bad motive arises from the mere fact that he gave her such assistance.

▮ While the jurors are the sole judges of the weight and sufficiency of the evidence, their province, in receiving or rejecting evidence as they were by the court instructed, is not arbitrary but is to be exercised with legal discretion and in subordination to the rules of evidence.

▮ Two conclusions must be established by the plaintiff in this case to support a verdict against defendant, first, that the defendant knowingly and wilfully influenced his

daughter to withdraw her affection and companionship from the husband, the plaintiff herein; and, second, that this was done in a spirit of malice and ill will toward the plaintiff.

■ The circumstances proved and attempted to be proved of harsh and unkind words of criticism of plaintiff by the defendant and assistance given to his daughter, the plaintiff's wife, do not prove or even raise an inference of act or effort to alienate her affections from the plaintiff.

*Hutcheson* v. *Peck, supra,* is universally referred to both in California and other states of the Union as the leading case. The decision was written over one hundred years ago by Justice Kent. Our Supreme Court in the case of *Hall* v. *Hall, supra,* quotes a passage from that opinion which has been perhaps more liberally quoted than any other American decision of which we know. It reads: "If the defendant did not stand in the relation of father to the plaintiff's wife I should not, perhaps, be inclined to interfere with the verdict. But that relationship gives rise to a new and peculiar interest. . . . A father's house is always open to his children, and whether they be married or unmarried it is still to them a refuge from evil, and a consolation in distress. Natural affection establishes and consecrates this asylum, and, according to Lord Coke, it is 'nature's profession to assist, maintain, and console the child'. I should require, therefore, more proof to sustain the action against a father, than against a stranger."

The rule is even more lenient in cases where there has been an elopement or secret marriage as in the case at bar. Parents have special rights and antagonism is to be expected where there has been a secret elopement or a secret marriage against the wishes of parents or where the child has married into an objectionable social status. Under the circumstances, we find no substantial evidence of malice in the conduct of the defendant towards the plaintiff in regard to keeping the daughter from the husband. There is no doubting appellant's severe feelings toward respondent nor that he exercised them freely in his home. The daughter chose to remain home notwithstanding these expressions. In the circumstances it would seem appellant was entirely within his rights. Had the young couple not chosen to begin the married life in secret and had openly assumed the marital rela-

tion in a domicile of their own or in the plaintiff's home with permission, the situation would have been entirely different. The use of strong language by the girl's father to the young man and his criticism of their actions in marrying secretly and precipitiously in the circumstances, all of which is shown by the transcript, cannot of itself establish actionable alienation of affection of the girl from her young husband.

Parents are justified in giving counsel and advice to a daughter who contracted a marriage with a man who is believed by them to be wholly unfitted to make her happy and to support her properly and if they act without malice and are prompted by affection for their daughter and solicitude for her health and happiness, they cannot be held liable for alienation. (*Kleist* v. *Breitung, supra*.)

Nor do we think that defendant did anything out of the way when he stated to his daughter that she might take her choice, either go to her husband or remain under her father's roof, but that she could not do both. The cases that we have cited and quoted from abundantly support this proposition.

There is no substantial conflict in the evidence as to the foregoing facts. The entire situation shows a lack of malice. There must be proof that her affections were actually alienated as the result of the machinations of the defendant. (*Codoni* v. *Donati*, 6 Cal. App. 83 [91 Pac. 423].)

Inasmuch as the judgment must be reversed, it would serve no useful purpose to take up the numerous other points urged by the appellant.

The judgment is reversed and, since the case was fully tried and no evidence developed against the appellant upon which a judgment could be based, the Superior Court is instructed to enter judgment for the defendant.

Stephens, P. J., concurred.

CRAIL, J., Dissenting.—I feel that the majority opinion states the evidence in the light most favorable to the appellant, whereas it is our duty on appeal to view the evidence in the light most favorable to the respondent. The evidence reviewed in the light most favorable to the plaintiff is fully

set out in the respondent's brief with citations as to where it may be found. I feel that there is some substantial evidence to support the implied finding of malice and that reasonable inferences fairly deducible from the facts and circumstances in evidence support the finding of the alienation of the daughter's affections by the defendant, and for that reason I believe that the judgment should be affirmed.