[Civ. No. 12343. Second Appellate District, Division Two.—April 18, 1940.]

MARIA THERESA BUSTOS JEFFERSON, Respondent, v. HELEN KENOSS, et al., Defendants; BENJAMIN H. JEFFERSON, Appellant.

Dockweiler & Dockweiler for Appellant.

Wyckoff Westover for Respondent.

MOORE, P. J.—This is an action for alienation of affections brought by the wife of Fleetwood Jefferson against his father, Benjamin H. Jefferson, and other parties. The trial resulted in a verdict in the sum of $5,000 against said Benjamin Jefferson and from the judgment based upon said verdict, he prosecutes this appeal. His contentions may be all dis-

cussed under two propositions, namely, (1) the insufficiency of the evidence to support the judgment; and (2) prescription by the one year's statute of limitation.

Plaintiff was born in the land of the Aztecs and is of their blood. In the tender years of her childhood, her immigrant parents settled in California and established their home in the city of Ventura. The child grew up in the city of her adoption and soon gave promise of a rare talent for song. Through the assistance of her admiring fellow townsmen, she was enabled to enter Occidental college as a student, where, in 1932, she met the said Fleetwood Jefferson, who was also marked with a flair for the musician's art. Their sudden interest in each other rapidly ripened into a mutual affection. Their marriage was celebrated on the 27th day of February, 1935, in the city of San Bernardino. After a brief honeymoon, Fleetwood escorted his wife to the home of her mother in the city of Ventura while he, himself, took shelter again under the roof of his father in the city of Pasadena. From that time he visited her weekly until the following month of April when they together occupied an apartment on North Marengo Avenue. Although defendant had opposed the marriage of his son, little harm came of this. But, after they had established their own residence within the shadow of defendant's home, the undermining of the foundations of the new domestic relations soon began. On the very day of plaintiff's return from Ventura to Pasadena, defendant called her into his office and there stated to her in the presence of Fleetwood: "Maria, you must remember that you must not come between Fleetwood and his career in any way. As long as you can, you must earn your own living, support yourself and let my son follow his own career."

In the following June when the plaintiff was ill in her home, defendant called in time to greet his son upon arrival, only to reproach him in a querulous tone for not answering the card he had written to the son. Fleetwood excused himself with the explanation that Maria had been ill and he himself had been busy. The defendant replied: "Maria's illness makes no difference. It is just that you think more of Maria than you do of me." Upon Fleetwood's protest that plaintiff was in a serious condition, the defendant proceeded: "That makes no difference; that is not a good reason for ignoring me either," and in making his exit, called out "Don't you

ever speak to me again.'' Thereafter, on other occasions when plaintiff was ill in her home, defendant accused her of feigning illness and told her that she might very easily become a hypochondriac and make it miserable for his son.

Defendant required Fleetwood to see him or communicate with him by telephone daily. Though he and his son were devoted to each other, the father never visited plaintiff at the hospital after the birth of his grandchild, and never entered the home where she lived in the absence of his son. So incensed was he at the presence of plaintiff that, notwithstanding the deep affection of his son for Maria, on March 1, 1936, acting upon defendant's advice, Fleetwood took Maria to Ventura to remain for a period with her parents. This was the beginning of the end of the continuous conjugal happiness which plaintiff and her husband had enjoyed for almost a year. The next time she met him was in the Superior Court of Los Angeles County to which Fleetwood had caused his wife to be summoned in an action for divorce. In the course of a conversation, in the silent presence of defendant, Fleetwood explained to his wife that it was his father and his family who had caused him to start divorce proceedings. Defendant had selected and retained an attorney to institute said action and had paid the cost of its prosecution. But, in the midst of the trial, a reconciliation was effected and that action was dismissed. It appeared thereafter for a while that plaintiff would enjoy her home again, but once more she had to drink the dregs of despair. On August 2, 1936, less than one month after said reconciliation, pursuant to appointment, plaintiff came from Ventura to meet her husband at a convenient corner in Hollywood. He was there accompanied by the defendant.

Plaintiff entered the automobile and a conference ensued in which Fleetwood explained that he must stay with his father. To all of her remonstrances, Fleetwood remained adamant in his obedience to the wishes of his father, who thereupon addressed plaintiff, saying: ''Will you shut up? Will you stop discussing those things in my presence? don't dare call me dad, now or ever. You have stolen my son's affections. You have ruined my household; you have about killed me and killed my wife; get out; get out, you damn hussy.'' Thereupon Fleetwood said to plaintiff: ''Now, dear, you can see what hell I have had to go through. Can you un-

derstand why everything is so upside down? Can you see how I have tried and tried and I get this every morning and every noon and every night? This is the sort of thing I have to go through for you. You know I love you and the only solution is to get away from this place, as far from my family as possible; we will straighten things out some way or other; we will have to straighten them out. We will go away from Pasadena and we will both go, if necessary, to San Francisco or out of the state. You are my wife and nobody has the right to interfere." Whereupon the defendant said: "All right, drive her to the hotel and be done with it," and when they separated at the hotel, Fleetwood said: "Don't worry too much, dear, it is just fate and the family is getting between us again."

Plaintiff was then left to abide in the home of her parents where she received an occasional visit from her husband. His last visit to her said home was on the 5th day of January, 1937, the occasion of their last act of cohabitation. They met again on the 28th day of May when they discussed once more the re-establishment of a home. During the spring of that year, plaintiff wrote a number of letters to Fleetwood, while he was residing at the home of the defendant; these letters were never received by the addressee.

Her frail bark was finally shattered on August 2, 1937, when she received a letter from her husband advising her that he had secured a divorce from her in Mexico. This was the first information which the plaintiff received of her husband's intention finally to separate from her. She undertook to communicate with him at the home of defendant where for the first time she was introduced by defendant to Helen Kenoss, who had celebrated a marriage with Fleetwood in the Republic of Mexico and was then living with him as his wife at defendant's home.

In her continued effort to contact Fleetwood, she again knocked at the door of defendant's home and inquired of him where she might find Fleetwood, to which the defendant replied: "I won't tell you" and slammed the door in her face.

In the course of the cross-examination of plaintiff, defendant's counsel elicited the testimony that on one occasion when Fleetwood had returned from a visit with his father, he stated to the plaintiff that his father had said to him: "Maria is not the wife for you, she will always be in the way. She is

a spineless, worthless invalid. She has been ill since you married and I can see no future for you unless you separate from her" and on another occasion, addressing plaintiff, Fleetwood said: "I have come to the conclusion, Maria, absolutely, that my family will never like you or like your family. I was terribly embarrassed at your home today. Your mother and your sister prepared a dinner for us but my father absolutely refused even to enter the door of your home, which embarrassed me very much." And again, Fleetwood said: "You know, Maria, I have come to the conclusion that you and I would have been very happy if it had not been for the interference of my parents. Now I am a man, I realize it should not have made any difference whether I married a Chinese or a white girl, or any other nationality. However, it is too late."

The fact that much of the foregoing was contradicted by defendant and his family and that many facts were given in testimony in favor of the defense is of no moment since the verdict is amply supported. No criticism is directed to the instructions of the court, or to the conduct of the jury, or to the behavior of plaintiff's counsel in the course of the trial. It is true that said hearsay evidence was received but it was proof of Fleetwood's state of mind. The letter of Fleetwood to his wife was received in evidence, without objection, to impeach his testimony to the effect that his father had not objected to the marriage.

 While more evidence is required to support a judgment for alienation of affections against a parent than against a stranger (*Horowitz* v. *Sacks*, 89 Cal. App. 336 [265 Pac. 281]) yet when a parent, from improper motives, induces his son to separate from his wife, such parent will be liable in damages to the aggrieved spouse. In such cases, it is not necessary to prove that the parent is moved by a malignant and revengeful disposition but it is sufficient if it be shown that he acted from improper motives. (13 R. C. L. 1471.)

 If the evidence is sufficient to show that the separation was the result of the improper and active interference of the parent and if it appears that the husband would have gone back to his wife but for such interference, either by threats, persuasions or arguments, then such parent has done a wrong to the wife of the son and she is entitled to compensation for the wrong. (*Oakman* v. *Belder*, 94 Me. 280 [47 Atl. 553, 80

Am. St. Rep. 396].) ■ The wife has the right to the conjugal affection and society of her husband; it is a valuable right and for loss of it by reason of the unlawful interference of another, she is entitled to compensation. No one is privileged to deprive a wife of the comfort and happiness which is hers by reason of her marital status and of her fulfillment of her own marital obligations. Also, the welfare of their children gives to each the right to the affection, companionship and society of the other. (*Price* v. *Price*, 91 Iowa, 693 [60 N. W. 202, 51 Am. St. Rep. 360, 29 L. R. A. 150].) ■ Although a parent has wide liberty in giving advice to his son relative to his domestic relations and may even advise him that his health or happiness will be rendered more nearly secure by putting away his wife, so long as he has not been actuated by malice or improper motives, yet if he was actuated by a vengeful spirit, he is liable in damages for causing the separation of his son from his wife. (*Multer* v. *Knibbs*, 193 Mass. 556 [79 N. E. 762, 9 Ann. Cas. 958, 9 L. R. A. (N. S.) 322].) ''It is no defense to an action for the alienation of the affections of a spouse that the conduct of the defendant was not the sole cause of the separation and loss of affections. It is sufficient if the defendant's conduct was the procuring or controlling cause of the alienation of affections although other reasons may have contributed to some extent.'' (*Rogers* v. *Haines*, 104 Cal. App. 191, 195 [285 Pac. 412].) The protection afforded the parent in such actions is neither universal nor absolute. If the facts are sufficient to warrant the jury in believing that the father has acted maliciously and unjustifiably in bringing about the separation of his son from his wife, the father is just as liable to the injured spouse as if he were a stranger. (Note, 46 L. R. A. (N. S.) 469.) ■ In the light of these authorities, the evidence was sufficient to convict the defendant of malice toward the plaintiff. His refusal to visit the hospital where his grandchild was born; his refusal to enter the home of the plaintiff in the absence of Fleetwood; his advice to his son to transport her back to her mother's home in the spring of 1936; his active interest in the prosecution of said divorce proceedings instituted by Fleetwood; his vicious behavior toward the plaintiff at said meeting on the 2d of August, 1936; his encouragement to Fleetwood to marry said Helen Kenoss in 1937, without having satisfactory knowledge of his divorce from the plaintiff,

and his numerous discourtesies and incivilities toward plaintiff at her home and at his home are sufficient, if believed by the jury, to prove that in all of his behavior toward plaintiff, he was prompted by malice.

The authorities cited by the defendant are not in point. (*Smith* v. *Kiger,* 5 Cal. App. (2d) 608 [43 Pac. (2d) 565]; *Bourne* v. *Bourne,* 43 Cal. App. 516 [185 Pac. 489]; *Hall* v. *Hall,* 174 Cal. 718 [164 Pac. 390].) In *Smith* v. *Kiger* the acts of the father complained of were done before her father knew that his daughter had been married. In *Bourne* v. *Bourne, supra,* the son had already been estranged by the behavior of his wife when the parents provided him with money to travel to New York. In *Hall* v. *Hall,* 174 Cal. 718 [164 Pac. 390], the wife had sold the furniture out of her home; had taken her son to another city, leaving her husband heartbroken. After some six months had passed, she was visiting her husband at the home of his parents where she caused a summons in her divorce action to be served upon him. There was no evidence of any unfriendly act done by either Mr. or Mrs. Hall calculated to entice their son from his wife prior to her action for divorce.

In view of the action of the jury upon the evidence they heard, under the correct instructions by the court, we see no reason to interfere with the verdict.

 Defendant's plea of the statute of limitations cannot be sustained. The action was filed April 13, 1938. Within the year preceding, Fleetwood had reaffirmed his vows of loyalty. From plaintiff's marriage until Fleetwood's final desertion of her, defendant had been persistent in his course of insulting plaintiff in the presence of Fleetwood and in much conduct calculated to separate his son from plaintiff.

In actions based upon tort the action accrues on the day of the wrongful act. When the last wrongful act was committed by defendant may be the subject of dispute, but the authorities and the record make it clear that the suit is not barred. Upon two theories it was within time: (1) If time began to run on the day the alienation was consummated, it is not barred. The "abduction" of the husband was a part of the wrong prohibited by section 49 of the Civil Code as it read at the time of the acts complained of. "Until that occurs, the statute of limitations cannot begin to run." (*Mohn* v. *Tingley,* 191 Cal. 470 [217 Pac. 733].) In this case the

final loss of the husband's affections was on a day subsequent to the last unfriendly act shown to have been committed by defendant, but the jury was justified in inferring that said loss was finally due to defendant's malice towards plaintiff.

(2) In no event did it commence to run before she had knowledge of his desertion. (*Mohn* v. *Tingley, supra.*) There were no means by which she could have learned the fact till long after April 13, 1937. Prior to that date plaintiff and her husband had been living in separate establishments and in different counties. Their visits were only occasional. Either the husband visited plaintiff at her home or they met in Los Angeles. This manner of intermittent visiting is a factor to be considered in the conduct of plaintiff with reference to the application of the statute of limitations.

On January 5, 1937, her husband visited plaintiff and they cohabited in the plaintiff's home at Ventura. On February 13th the husband wrote plaintiff a letter in which he said: "Love to both you and the baby." On February 23, 1937, he again wrote plaintiff, saying: "Things are gradually getting ironed out down here. . . . I hope that you and Jeff are making the most of this wonderful weather. . . . Write me and let me know about Jeff. Thanks for your last letter. Love. Fleetwood." In May of 1937, within the year, plaintiff met her husband several times in Los Angeles. On May 28th she accompanied him to dinner at the Angelus Hotel and then they went for a drive. In a long conversation they discussed the reestablishment of their home. He reproached her for not having written him prior to her entrance into the hospital on the occasion of her tonsillectomy. He waxed warm in declaring his love for plaintiff; took her hand; kissed her good night several times and promised that very soon he would have a home for her. Surely she could not have known on that day that he had deserted or intended to desert her.

Her first knowledge of his desertion came on August 2, 1937, when she was advised by his letter that he had secured a divorce from her in the State of Chihuahua. Prior to that letter she had no knowledge or belief that he was contemplating a separation. On that day he had already taken said Helen Kenoss as a wife, of which fact plaintiff was in utter ignorance.

Our courts have followed the rule of fixing the date from which the statute should begin to run as the date on which

the wife first had knowledge of and believed that her husband had abandoned her. (*Mohn* v. *Tingley, supra.*) In *Davis* v. *Conant,* 10 Cal. App. (2d) 73 [51 Pac. (2d) 151], although defendants' last hostile act towards the plaintiff was on December 26, 1932, the action was filed on December 29, 1933. The statute did not begin to run then because the plaintiff and her husband cohabited after January 1, 1933, showing her lack of knowledge of his purpose to desert her. The first notice by the husband of his intention to desert his wife was when he filed his suit for annulment on February 7, 1933.

Certain authorities appear at first glance to support a contrary rule, but they do not. In the case of *Tofte* v. *Tofte,* 12 Cal. App. (2d) 111, 112 [54 Pac. (2d) 1137], it is said that "the record is replete with evidence *that respondent knew and believed that her husband's affections had been stolen from her* by the appellant herein as far back as 1927". More than one year preceding the commencement of the action, in her answer to the divorce case filed by her husband February 21, 1928, she affirmatively alleged that her husband deserted her on December 15, 1927. While her action was filed October 13, 1932, she had known that it had accrued five years before, which, of course, barred recovery.

The older case of *Bouchard* v. *Reed,* 7 Cal. App. (2d) 652 [46 Pac. (2d) 800], cited by defendant, bases its holding upon *Harp* v. *Ferrell,* 115 Cal. App. 160 [300 Pac. 978]. But there is nothing in the latter case contrary to the holding of *Mohn* v. *Tingley* and *Davis* v. *Conant, supra.* Mrs. Harp knew the exact period that the wrongful acts of defendant had continued, but because she offered no excuse for her delay in filing her action for over one year and three months after the last act complained of, she failed to toll the statute. The holding in the Bouchard case that "if a cause of action could arise in plaintiff's favor . . . it became barred one year after the last wrongful act of the defendant" was *dictum.* The facts had been found against the plaintiff. But an inspection of that record discloses that he offered no excuse in his pleading for his delay beyond a year after the acts complained of.

Therefore, upon either theory of calculating the running of time, plaintiff's filing herein was timely.

The judgment is affirmed.

Wood, J., concurred.

McCOMB, J., Dissenting.—I dissent.

Stripped of immaterial verbiage, these are the essential facts:

Plaintiff and defendant's son Fleetwood Jefferson were married February 27, 1935, at San Bernardino, California. At the time of the marriage defendant's son was unable to support his wife and defendant advanced him money to enable him to marry and for maintenance for several months thereafter.

Immediately after the marriage the couple went to Santa Monica, California, where they spent the night. The bride then returned to her mother's home in Ventura, California, and the groom to his father's home in Pasadena, California. In April of the same year the couple took an apartment in Pasadena and plaintiff testified that at this time defendant said:

"Maria, you must remember that you must not come between Fleetwood's career in any way. As long as you can, you must earn your own living, support yourself, and let my son follow his own career."

"Maria, of course you know that I feel that my son also can have a musical career, and I feel in a few years he will be able to sing in the Metropolitan, and it is up to both of us, by not interfering whatsoever, for him to make a success."

"My wife has objected to you because you are not wealthy."

"We have both been interested in having Fleetwood marry a girl with means, and wealth, so that nothing could interfere with his career."

Plaintiff further testified relative to an incident occurring in May, 1935, at which she, her husband, and defendant were present, as follows:

"It was in the evening, my husband was coming home from work. I heard footsteps in the hall, and the slamming of a door, and I heard Mr. Jefferson, Sr., say, 'Why didn't you answer my card?' My husband replied: 'Dad, I would have answered your card, but Maria has been so ill, I have been so busy.' Then they proceeded to the room adjoining mine, there was no door between, and Mr. Jefferson, Sr., said, 'Maria's illness makes no difference, it is just that you think more of Maria than you do of me, and more of your home.' And my husband said, 'Dad, you can see for yourself, Maria

is in a very serious condition.' And Mr. Jefferson, Sr., replied: 'That makes no difference, that is not a good reason for ignoring me, either.' I remember I was very nervous, and I called: 'Dad, dad, won't you listen to me, I am so ill, we would have answered your card, please forgive me.' And Mr. Jefferson, Sr., just turned around and slammed the door and left the place. My husband came to my side and tried to comfort me for a moment, and he said, 'There, I have to follow my father, he is very angry.' And as Mr. Jefferson, Sr., was walking out the door, he said, 'Don't you ever speak to me again,' and out he went. A few minutes later my husband left."

Also she testified:

(a) My "husband had to visit his father every single day, and call him, or Mr. Jefferson, Sr., would be very disturbed."

(b) Defendant was "always trying to make my husband believe that I was feigning my illness, that I was not as ill as I was. It was only natural".

(c) Defendant said, " 'Maria, you must remember having a baby is a normal thing, it seems to me you should know that, think of my own wife and the misery she made me by being ill all of her life.' 'My wife is a hypochondriac, and I can see very easily you can become one if you are not careful, and make it miserable for my son.' "

They lived together in the apartment they had rented in Pasadena until the first part of June, at which time plaintiff, due to illness, went to a hospital, where she remained for several weeks, and upon leaving the hospital she returned to her mother's home in Ventura, where she stayed until approximately the latter part of August, at which time she returned to Pasadena and lived in the same apartment with her husband until December 14, 1935, there having been born on September 29, 1935, to them a son.

On December 14, 1935, the couple moved to a dwelling house in Pasadena where they lived together until March 1, 1936, at which time plaintiff again returned to her mother's home in Ventura. In March of 1936, plaintiff was served with a summons in a divorce action filed by her husband in Los Angeles County. Defendant objected to his son's bringing an action for divorce, but when he found that the son was determined to proceed he employed a reputable lawyer Mr. Brooks Gifford of Pasadena to represent his son. In July,

1936, a reconciliation was effected between the parties, and on stipulation a judgment was entered denying relief to either party in the action. Immediately after the so-called reconciliation plaintiff returned to her mother's home in Ventura and her husband remained with his father in Pasadena. They never thereafter maintained a common habitation. The next time plaintiff saw her husband was in Hollywood August 2, 1936, at which time she held a conference with him in the presence of defendant, her version of which is as follows:

''Well, my husband had asked me to come to Los Angeles, so when I came that Sunday morning, I had an opportunity to come, I telephoned his residence and I was told he was taking a voice lesson, so I called his voice teacher, and finally located my husband, and he asked me to meet him at a convenient corner in Hollywood. I met him but he was not alone, he was with my father-in-law. After his greeting me, he kissed me there on the street corner, I recall, and we walked arm in arm to his car. We got there, and I said, 'Good afternoon,' it was after lunch time, and my father-in-law again made no reply, got out of the car, and my husband helped me in the car and he sat next to me, and we went along, and finally I asked my husband, I said, 'Fleetwood, do you think we can reestablish our home, do you think it will be very, very soon?' And my husband said, 'Well, dear, I don't know, my father says that I have to stay with him in Pasadena, and he suggests perhaps it will be a good thing for you to find a little place in Hollywood where you could renew your contacts with the moving picture studios and where you possibly could do some teaching in music and that would help a great deal. In the meantime, I just have to stay with dad, dad wants me to stay with him.' I said, 'Fleetwood, you promised in the court room, you made a statement that we would come and live together in just two or three months, and here I have been so excited, and I want my home, and I want to be with you, don't you love me?' And he said, 'Of course I love you, still my father thinks, he says I must stay with him in Pasadena, and we are to find a place for you here in Hollywood.' I objected, I said, 'Fleetwood, I think that is very impracticable, because the baby is so little I have to take care of him, or I have to pay someone to take care of him while I try to get myself on my feet.' I was still not very well, and I said, 'We could be so happy in just a tiny little place we could get together

on what you are earning now, and everything will be just perfect for both of us.' And just then my father-in-law said, 'Will you shut up, will you stop discussing those things in my presence.' I turned to him and said, 'Well, I am sorry, dad,' I was quite embarrassed, and he just looked at me and said, 'Don't you dare call me dad, now, or ever,' he said, 'you have stolen my son's affections, you have ruined my household, you have about killed me and killed my wife,' and he said, 'get out' and he opened the door of the car and just then he came to the boulevard stop and he opened the door and he said, 'Get out.' I was—I did not expect this, of course, and I said to my father-in-law, I said, 'Dad,' I hesitated, I said, 'I have a right to speak to my husband.' I said, 'Fleetwood, how can you sit there and listen to my father-in-law insult me.' And he said, 'Get out, you damn hussy.'—My father-in-law said that. Of course, by that time I was in tears and I said, 'Fleetwood, can you sit there and listen to your father insult me this way, don't you love me any more?' And my husband said, 'Now, dear, you can see what hell I have had to go through, can you understand why it is everything is so upside down, can you see how I have tried and tried, and I get this every morning and every noon and every night, this is the sort of thing I have to go through for you, you know I love you, and the only solution is to get away from this place, and as far away from my family as possible.' Of course, I was weeping at that time.''

Plaintiff did not get out of the car but defendant did and a conversation ensued between herself and her husband. Thereafter defendant got back into the car and said, "All right, drive her to the hotel, and be done with it.''

January 5, 1937, plaintiff's husband visited her in Ventura and on that occasion for the last time cohabited with her.

June 21, 1937, defendant's son married a former acquaintance, Helen Kenoss, at Tijuana, Mexico, Miss Kenoss understanding that defendant's son had obtained a divorce which would permit him to marry her. She and her husband occupied an apartment above a garage on the premises of defendant's residence. August 2, 1937, plaintiff's husband wrote her that he had obtained a divorce from her at Chihuahua.

Plaintiff testified that January 29, 1938, she drove to defendant's home in Pasadena with a Mrs. Rideout and that when

she asked defendant where she could find his son he slammed the door in her face and said, "I won't tell you." The complaint in the present action was filed April 13, 1938.

Defendant relies for reversal of the judgment, among others, on this proposition:

*Plaintiff's cause of action, if any, is barred by the statute of limitations (sec. 340, subsec. 3, Code Civ. Proc.)*

This proposition is tenable and is governed by the following principles of law:

(1) The period of limitation for bringing an action for alienation of affections is one year as prescribed in section 340 of subsection 3 of the Code of Civil Procedure. (*Tofte* v. *Tofte,* 12 Cal. App. (2d) 111, 112 [54 Pac. (2d) 1137].)

(2) In an action for alienation of affections the period of limitation begins to run from the last wrongful act of the defendant (*Bouchard* v. *Reed,* 7 Cal. App. (2d) 652, 654 [46 Pac. (2d) 800]).

In *Bouchard* v. *Reed, supra,* it is said at pages 653 and 654:

"The judgment in favor of respondent is based upon the conclusion of law of the trial court that plaintiff's cause of action was barred by the statute of limitations. . . . If a cause of action could arise in plaintiff's favor without his wife leaving him, it became barred one year after the last wrongful act of the defendant. (*Harp* v. *Ferrell,* 115 Cal. App. 160 [300 Pac. 978].) Plaintiff's complaint was filed August 8, 1932, and upon the findings of fact before us his action was barred at that time."

It is to be noted in passing that Mr. Justice Houser, now a member of our Supreme Court, was a member of the court which rendered the decision in *Bouchard* v. *Reed, supra.*

From a reading of the case and the portions of the opinion just quoted, I am unable to agree with my learned associates in the statement that the language quoted was *dictum.*

Applying the foregoing rules to the facts in the instant case, it appears that the complaint was filed April 13, 1938, and that the last wrongful act charged against defendant was August 2, 1936, which was more than a year prior to the filing of the complaint. Therefore, plaintiff's cause of action, if any, was barred by the statute of limitations.

In addition to the fact that in my opinion the statute of limitations has barred any cause of action, I am satisfied that the plaintiff has not sustained the burden of proof which is

required to support such an action as the present. In *Hall* v. *Hall,* 174 Cal. 718, an action for alienation of affections, our Supreme Court at page 726 [164 Pac. 390] states the rule:

"Actions for damages against parents for the alienation of the affections of their married child from his or her spouse are frequent in the law, and the principles governing the introduction of evidence and the weight to be given it are well settled. Having in contemplation the natural solicitude of the parent for the child, and the well-nigh universal experience of mankind that parents in their conduct toward their children are actuated by high and disinterested motives, involving the sacrifice of their own interest for the welfare of the child, it is not to be lightly inferred that the language or conduct of such a parent toward a child is prompted by evil and malicious motives. Therefore, to establish such wilful and malicious alienation, *'the measure of proof must be extremely high'.''* (Italics added.)

In *Cripe* v. *Cripe,* 170 Cal. 91, 93 [148 Pac. 520], our Supreme Court says:

"The decisions require a much stronger case to be made out where the defendant is a parent of the spouse alleged to have been enticed."

In my opinion the facts are no stronger in the instant case than were those in *Bourne* v. *Bourne,* 43 Cal. App. 516 [185 Pac. 489], wherein the court held there was insufficient evidence to sustain an action against a parent for alienating the affections of a child. The evidence in the instant case does not meet the high degree of proof required by the adjudicated cases.

For the foregoing reasons the judgment in my opinion should be reversed.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 17, 1940.